**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. JKB-12-0103 |
| | ) | |
| PATRICK BELZNER, | ) | **(FILED *EX PARTE* AND** |
| a/k/a "Patrick McCloskey," | ) | **UNDER SEAL)** |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

**THE UNITED STATES OF AMERICA'S *EX PARTE* MOTION
TO REVOKE THE DEFENDANT'S PRE-TRIAL RELEASE CONDITIONS
AND DETAIN HIM PENDING THE TRIAL OF THIS CASE**

ROD J. ROSENSTEIN
UNITED STATES ATTORNEY

Jefferson M. Gray
Kathleen O. Gavin
Assistant United States Attorneys

U.S. Attorney's Office
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4915

Date: August 12, 2013

# **TABLE OF CONTENTS**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     A.      Belzner's Victimization of Ms. R.S. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     B.      Belzner's Victimization of Ms. L.M. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     C.      Belzner's Efforts to Solicit Funds Ostensibly to Benefit a Girls'
                Basketball Team in Ocean City . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     D.      Belzner's Victimization of Ms. L.J. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

     E.      Belzner's Past Victimization of Other Neighbors and Friends. . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

       BELZNER'S PRE-TRIAL RELEASE CONDITIONS SHOULD BE
       REVOKED AND HE SHOULD BE DETAINED PENDING TRIAL,
       BECAUSE HIS RECENT CONDUCT DEMONSTRATES THAT HE
       PRESENTS BOTH A PECUNIARY AND A PHYSICAL DANGER TO THE
       COMMUNITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**INTRODUCTION**

Pursuant to 18 U.S.C. § 3148(b), the United States of America, by its undersigned counsel, hereby moves to revoke defendant Patrick Belzner's conditions of pre-trial release and to detain him pending trial.  The government further requests that the Court issue a warrant for Belzner's immediate arrest.  Once Belzner is in custody, this filing can be disclosed to counsel for the defense.  The government will then seek to have Belzner detained pending a full hearing in this matter.

The grounds for this motion are twofold.  First, the government has recently learned that since February of this year, the defendant has obtained approximately $100,000 in "loans" from two different women, Ms. R.S. and Ms. L.M. – of whom the latter is a 74-year-old retiree – and has made another $95,000 in credit card charges on cards obtained in Ms. L.M.'s name, using her personal identifiers.[1]  The defendant sought these loans and used the credit cards for various stated purposes, which included helping the defendant meet various alleged personal and family expenses, along with taking control of and re-opening a defunct restaurant in Selbyville, Delaware.  While a significant part of the funds obtained by the defendant were used in connection with the restaurant, which re-opened about six weeks ago, the government believes that the defendant also diverted substantial funds to his own use.   To date, the defendant has not provided an accounting or receipts to the women to account for how much of the "borrowed" money was spent.  The government has also been advised by Ms. R.S. that when the defendant was recently discharged as the restaurant's general manager, he

---

[1]  Ms. L.M. acknowledges that she authorized the defendant to obtain or use three or four of these cards, but not the remaining ones.  She also maintains that he made some unauthorized charges even on the cards she authorized him to obtain or use.

removed personnel files from the restaurant that contain personal identifying information for the restaurant's employees.

Based upon the information developed thus far by our investigators, there is probable cause to believe that the defendant has committed multiple violations of both federal law (including access device fraud in violation of 18 U.S.C. § 1029(a)(2), as well as mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343) and the law of the state of Delaware (where the defendant is currently residing), including theft (in violation of Del. Code Ann. Title 11, § 843(a) & (b)); theft by false pretenses (Del. Code Ann. Title 11, § 843); theft by false promise (Del. Code Ann. Title 11, § 844); and identity theft (Del. Code Ann. Title 11, § 854(a)).[2]

Ms. R.S. and Ms. L.M. have further advised the government that the defendant is drinking very heavily on a daily basis.  This violates the defendant's release condition that he not engage in excessive consumption of alcohol, and raises serious concerns that he currently presents not merely a pecuniary danger to the safety of the community, but a physical danger to the safety of other drivers and pedestrians.

## FACTUAL BACKGROUND

Defendant Patrick Belzner is presently charged by indictment with orchestrating an extensive wire fraud scheme, which ultimately resulted in losses totaling approximately $14.730 million to a number of real estate developers, individual investors, investment partnerships, and so-called hard money (private) lenders.  In addition to these larger victims, however, the government's investigation has also

---

[2]   These statutes are attached as **Exhibit 1.**

2

revealed that during the six years preceding his February 29, 2012 indictment, Belzner

victimized several other individuals of modest means whom he had come to know as

neighbors or fellow players in a recreational softball league.[3]  In each of these cases,

Belzner importuned these individuals for what he represented would be short-term

loans, asserting that he needed help to get through an immediate cash crunch.  His

unfortunate victims then saw the promised repayment dates slip past without action,

receiving instead elaborate excuses and explanations – and, frequently, further requests

for additional funds which, Belzner assured them, would make possible repayment of

the  outstanding debt.  In several instances, Belzner persuaded the targeted individuals

to open new credit cards under their own names and then to either give the credit cards

to him for his use, or to use the cards to obtain cash advances which they then provided

to Belzner.  This conduct is strikingly similar to the defendant's recent actions with

regard to Ms. R.S. and L.M.

Based upon the information it had developed relating to Belzner's past conduct

during the investigation, the government believed he presented an economic danger to

the community (as well as a flight risk), and therefore asked that he be detained at his

initial appearance.  The Court instead placed the defendant on a $100,000 bond that

was partially secured by his father's and mother's residence, and imposing several other

conditions as well.  **Exhibit 2** (final Belzner release order).  Following his arrest,

Belzner relocated his family from Baltimore County to a trailer he owned in Selbyville,

---

[3]     The stories of some of these individuals are summarized at pages 15-19 *infra*, and interview memos summarizing their accounts of their experiences with Belzner are included as **Exhibits 8-10.**

Delaware.  He has lived and worked in that area of the Delaware shore since the time of his arrest, first as a manager at a Pizza Hut and then in the deli department of a Food Lion store.

Within the past three weeks, however, the government has learned that Belzner had persuaded Ms. R.S., a fellow worker in the deli department at the Food Lion store, to lend him $106,000 over a period of several months, starting in February of this year. Some of these funds were solicited by Belzner for the ostensible purpose of helping him meet various short-term personal, family, and other expenses (including jerseys for a girls' athletic team), but it appears that most of it was requested by Belzner for the stated purpose of taking over and then operating a defunct restaurant called Fenwick Oasis on Fenwick Island, Delaware.  While the government does believe that at least part of Ms. R.S.'s funds were used for restaurant-related purposes, Belzner's insistence that Ms. R.S. provide him with the funds in cash (along with Belzner's past track record of similar conduct) strongly suggests that he also diverted a substantial part of the money he received from Ms. R.S. to his own personal use.

Ms. R.S., a woman of modest means, did not have anything close to $106,000 of her own discretionary funds available to lend to Belzner.  Instead, as in some of the other cases detailed at pages 15-19 *infra*, Belzner persuaded her to borrow money from friends; to seek loans from short-term lenders, and then to give the money to him; and, in one case, to accept a significantly reduced payment as part of a divorce settlement from her former husband in return for getting the funds more quickly, all so that she could make them available to Belzner.

Belzner also persuaded Ms. L.M., a 74-year-old retiree who was a close friend of Ms. R.S., to authorize him to open several credit cards in her name for the purpose of charging expenses associated with getting the restaurant re-opened.  In response to Belzner's request, Ms. L.M. provided him with her personal identifying information – including her date of birth, social security number, and her mother's maiden name  – so he could apply for three or four credit cards.  According to Ms. L.M., Belzner then proceeded to apply for no less than nine cards, on which he has now run up total charges of over $95,000.00, of which over $67,000 was incurred on the cards Ms. L.M. did not authorize him to open.  (Even on the cards she did authorize Belzner to open or use, there appear to be some personal charges by Belzner that Ms. L.M. says she did not authorize.  While most of the charges incurred on all of the cards Belzner obtained using Ms. L.M.'s personal identifiers do appear related to re-opening the Fenwick Oasis restaurant, which occurred on or about June 29th, that cannot excuse Belzner's conduct in seeking additional cards not authorized by Ms. L.M. and then running up substantial charges on them.  (The unauthorized use of personal information to obtain credit cards constitutes identity theft under both federal and state law.)

Moreover, Ms. R.S. has advised that when she learned about Belzner's pending fraud charges and fired him as the general manager of the newly reopened restaurant approximately three weeks ago, he responded by removing all the personnel files for the restaurant's approximately 18 employees and taking those with him when he left the premises.  Belzner has no known legitimate need for those files, and his possession of them raises the possibility that he might use the information they contain to carry out additional acts of identity theft.

Belzner's actions over the past several months demonstrate that he is incapable of remaining on pre-trial release without financially victimizing people.  His conditions of pre-trial release should therefore be revoked, and he should be detained pending trial.

## STATEMENT OF FACTS

### A.    Belzner's Victimization of Ms. R.S.

As detailed in the attached FBI report summarizing an interview with Ms. R.S. conducted on July 29th (**Exhibit 3**), Ms. R.S. had worked at a Food Lion grocery store located in Selbyville, Delaware as a Deli/Seafood manager for the past 5 years.  Belzner (who had recently left his employment as manager of a Pizza Hut) was hired by the store and put to work in the Deli/Seafood Department, where Ms. R.S. soon came to rely upon him heavily, regarding him as her "right hand person."  Shortly thereafter, Ms. R.S. reported, Belzner began asking her for money.  First, he claimed he needed $2,000 to cover jerseys for his daughter's athletic team (as pages 13-14 *infra* indicate, Belzner was also soliciting funds from other people he knew with the same justification around this period of time).  Then it was $600 or $700 to cover his family's outstanding cell phone bill; then $2,000 more for jerseys.  Next, although these debts totaling nearly $5,000 to Ms. R.S. remained outstanding, Belzner proposed to her that he, she and a third woman (Ms. T.T.) should go into business together, re-opening the defunct Fenwick Oasis restaurant in Selbyville.  When Ms. R.S. went to look at the restaurant, one of her favorite sayings – "Everything happens for a reason" – was written on the wall.  Ms. R.S. interpreted this as a sign that she should go forward with the restaurant venture.  She agreed to go into business with Belzner, and at his behest contributed another $5,000 to

the effort to re-open the restaurant.  Ms. R.S. has advised investigators that the incorporation papers that Belzner had prepared for this venture gave members of Belzner's family a 46% interest; Ms. R.S. a 46% interest; with the remaining 8% going to the third woman.

Over the following months, Belzner persuaded Ms. R.S. to obtain additional funds for him from a variety of sources.  He urged her to take out a loan, and when Ms. R.S. responded that she didn't think she could qualify for a loan because her credit was not very good, Belzner provided her with a list of several lenders whom he said would be willing to loan her money.  Ms. R.S. applied to each and was able to get a total of $12,000 in loans from the payday or installment loan companies Western Sky ($2,000), The Cash Line ($2,500), and One Main Financial ($7,500).  Belzner instructed Ms. R.R. to deposit these funds into her bank account and then to give him the proceeds in cash, which she did.  Belzner has never made an accounting or produced any documentation as to what he did with these funds, which strongly suggests that he diverted these funds to her personal use, and employed them for other than the justifications he gave to Ms. R.S.

As Belzner continued to press her for cash, Ms. R.S. reached out to a friend of hers named J.B. for a loan, and he agreed to provide her with $14,000.  Again, Ms. R.S. reports that Belzner told her that he wanted the proceeds in the form of cash.

Next, Belzner asked Ms. R.S. whether she had any gold that she could sell to help fund the restaurant, telling her that once the restaurant opened, she would have plenty of money to buy new jewelry with.  So Ms. R.S. sold $3,000 of her jewelry to a store in Ocean City.  Once again, Belzner instructed her to give him the proceeds in cash.

According to Ms. R.S., Belzner also persuaded her to accept a significantly reduced pay-out on her divorce settlement in return for getting the money more quickly, so that it could be used to help get the restaurant re-opened. Ms. R.S. therefore agreed to accept only $20,000 rather than $60,000 as the pay-out from her ex-husband's 401(k) plan. Again, Belzner had her deposit these funds into her bank account and then give him the proceeds in cash. Later, when her husband gave Ms. R.S. another $6,500 in cash, she gave that to Belzner as well.

Belzner also persuaded Ms. R.S. to use her trailer home as collateral so that he could obtain another $15,000 loan from Mr. M.S., who was the son of the owner of a jukebox and game machine company that had approached Belzner about installing its machines at the restaurant. Mr. M.S. reported that although he was reluctant to give Belzner and Ms. R.S. the money, he eventually agreed to do so because Belzner "hound[ed]" him and "constantly begged for the money." **Exhibit 4** (FBI Interview Report dated 8/8/13). Ms. R.S. received a $15,000 certified check from Mr. M.S., and once again, Belzner instructed her to provide the proceeds to him in cash. Belzner promised Mr. M.S. that he would repay the loan in three months and pay 20% ($3,000) interest; the loan is currently due to be repaid in just over a month, and Ms. R.S. has advised us that she has no way to repay it.

Belzner also persuaded Ms. R.S. to pay over her federal income tax refund ($5,800) and her state income tax refund ( $300) to him. In all, Ms. R.S. estimates that she has loaned Belzner $106,000.00 in the past five to six months, part of which she in turn borrowed from other persons.

8

When the Fenwick Oasis restaurant re-opened for business on June 29th, with Belzner acting as the general manager, his involvement in the business was characterized by repeated financial irregularities, according to Ms. R.S.   Belzner was not a signatory on the business's checking account, but not long after the restaurant opened, Ms. R.S. discovered that the checkbook was missing.   She asked Belzner if he knew what had become of it, and he responded that he was keeping the checkbook in his car, because that was better than leaving it unsecured at the restaurant.   Ms. R.S. further stated that she had not seen the account statements for the Fenwick Oasis checking account because Belzner took them out of the mailbox before she could get them.   He also sometimes asked her to sign blank checks without providing any documentation of the expenses that these checks would be used to meet.   Belzner promised Ms. R.S. that she would get a copy of all receipts related to his purchases, but this never occurred.

Ms. R.S. finally learned about Belzner's criminal indictment from a friend not long after the restaurant re-opened.   Initially, she responded by demanding that Belzner produce the receipts to support the various purchases he claimed to have made.   When he failed to do so, she confronted him about his pending indictment, and his failure to disclose this to her.   Belzner attempted to minimize the indictment's significance, claiming variously that it related to the housing market crash (the August 2009 start date of the scheme charged in the indictment is actually nearly a year after the crash occurred) and that it arose out of a situation where he was involved with some attorneys, who framed him.   Ms. R.S. then informed Belzner that she no longer wanted him involved in the restaurant, a decision she was able to take because she and the third woman between them had majority control of the LLC.

9

According to Ms. R.S., after Belzner left the restaurant, she discovered that he had taken copies of the employees' driver's licenses and social security cards, as well as 10 to 12 employees' payroll checks. She further believes that Belzner took about $1,200 in cash out of the cash register before leaving.

Ms. R.S. also reported that Belzner displayed evidence of a serious alcohol problem. She stated he was "drunk by 1 p.m. on a daily basis," and that by 8 p.m. or 9 p.m. at night, "Belzner was usually really drunk."

### B.    Belzner's Victimization of Ms. L.M.

Ms. L.M. is a 74-year-old widow and retired real estate agent who was Ms. R.S.'s best friend. **Exhibit 5** (IRS-CID Memoranda summarizing 7/22 & 7/29/13 interviews). Ms. R.S. reached out to Ms. L.M. for assistance in meeting the costs of getting the restaurant renovated and re-opened for business. Initially, she transferred funds from her savings account and then she wrote a series of checks to Ms. R.S. that totaled about $16,000 - $20,000 to pay for the needed renovations. Next, in response to assertions by Belzner that he needed credit cards to meet additional expenses for the restaurant, Ms. L.M. authorized Belzner to open three to four credit cards using her personal identifiers. Belzner assured Ms. L.M. that he would promptly repay the charges incurred on the cards as soon as the restaurant opened. Ms. L.M. understood that one of the items Belzner needed to pay for was some plumbing work.

Ms. R.S. soon discovered that Belzner had opened up not three to four credit cards in her name, but at least nine. Moreover, the balances he had incurred on these cards totaled in all more than $95,000.00, as shown below:

| CREDIT CARD | AUTHORIZED OR UNAUTHORIZED? (per Ms. L.M.) | CHARGES INCURRED AND OUTSTANDING | OTHER NOTES |
|---|---|---|---|
| American Express | Unauthorized | $35,094.33 | The transactions include almost $19,000 in plumbing charges, and over $11,000 in food charges, which are restaurant-related, but Ms. L.M. believes other charges to Harris Teeter and BJ's Wholesale are not. |
| Bank of America Visa | Unauthorized | $5,712.47 + $2,800 in cash advances = $8,512.47 | Ms. L.M. states that she did not authorize Belzner to obtain any cash advances.  She also stated that it appeared that Belzner had used this card to make personal payments for electricity, water, and his Comcast bill, as well as personal liquor purchases. |
| Fred Meyer/ US Bank | Unauthorized | $13,750.82 | Almost all of these charges were for purchases from Chesapeake Food Service. |
| Citi Platinum Select Visa | Unauthorized | $7,387.30 | $7,000 of these charges were for purchases from Chesapeake Food Service. |

11

| Capital One | Unauthorized | $2,771.92 | Many of these charges were to Fenwick Hardware or to Chesapeake Food Service, but others were to Food Lion, an Exxon Mobil station, a pizza and subs restaurant, DollarTree, and a liquor store, which Ms. L.M. does not believe were restaurant-related. |
|---|---|---|---|
| Barclay-Card | Authorized | $5,796 + cash advance of $3,800 | The largest single charge on this account is to Hy-Point Equipment ($5,000).  Other charges are to Pier One, Dollar Tree, BJ Wholesale and Bed Bath & Beyond. |
| Chase | Authorized | $5,386.66 | $4,000 was charged to purchases from Chesapeake Food Service; there were also two $400 cash advances, which Ms. L.M. says she did not authorize. |
| HSBC Platinum Master-card | Authorized | $7,155.84 | $8,900 of this was for a charge to Hy-Point Equipment; another $203 was to Comcast, at a date prior to the opening of the restaurant. |
| Discover | Authorized | $6,000 | The balance here was based upon two charges to Chesapeake Food Service. |
| **TOTAL:** | | **$95,655.34** (of which **$67,516.84** came on the unauthorized cards) | |

Ms. L.M. advised investigators that she had asked Belzner to return the credit cards to her, but that whenever she saw him after that, he always claimed that he did not have the credit cards on him or that they were at his house.

Ms. L.M. also indicated that Belzner began drinking every day as early as 11 a.m.[4]

### C.   Belzner's Efforts to Solicit Funds Ostensibly to Benefit a Girls' Basketball Team in Ocean City

Ms. R.S.'s statements that Belzner borrowed some $4,000 from her, claiming that it was needed to pay for uniforms for a youth sports team, echoes similar information that the government received from other individuals during March 2013 indicating that Belzner was soliciting money from various people he knew and from local businesses to support a girls' basketball team known as the O.C. Tidal Waves.  The government subpoenaed bank records from a small local bank known as Taylor Bank, which established that Belzner had opened up an account there in the name of the O.C. Tidal Waves on March 15, 2013, into which he deposited three checks from a couple, a local businessman, and an Elks Club chapter – totaling $1,150.00 .  **Exhibit 7** (Taylor Bank records).  A recreational center volunteer with whom Belzner was working to set up the team refused to have any further dealings with him on March 15th when he learned of Belzner's past criminal record and current charges, and the team therefore never got started.[5]   The Taylor Bank account records nevertheless reflect that over the

---

[4]   Last week, Ms. R.S. and Ms. L.M. advised the victim-witness coordinator in the U.S. Attorney's Office that Belzner was drinking heavily in area bars since being discharged from the restaurant.

[5]   The government also recorded several telephone calls between this individual and Belzner about this matter.

next ten days, Belzner wrote a series of checks to "cash" and withdrew the funds by that means, although he placed notations on the memo lines suggesting that this cash was being used for team-related costs or, in one case, a refund to a contributor.

At around this same period of time, the government learned that Belzner was periodically wiring money from a Western Union office located in a Harris Teeter grocery store to various international locations, as detailed below:

| TRANSACTION DATE (if legible) | AMOUNT OF FUNDS SENT | RECIPIENT (LOCATION) |
|---|---|---|
| 9/30/12 | $600 | Elberth Munoz-Porras (Costa Rica) |
| 10/4/12 | $500 | Jose Rivera-Jimenez (Costa Rica) |
| ??/5?/12 | $520 | Jerrolyn Montoya-Howlett (Costa Rica) |
| 10/07/12 | $360 | Katherine Martinez Aguilar (Costa Rica) |
| 3/??/13 | $350 | Leonidiza Calica (The Philippines) |
| 3/27/12 | $180 | Gilbert Rojas-Viquez (Costa Rica) |
| ?????? [date not legible] | $640 | Huyen-Tran Thi-Nguyen |

Based upon another financial investigation in which a similar pattern of conduct was present, the government believes that these payments are all probably connected to internet gambling by Belzner.  (Belzner has in the past cited a gambling addiction as the cause of his embezzlements totaling nearly $1.3 million in the mid-1990's from his employers Monumental Construction and U.S. Food Service.)  That raises a concern that at least part of the proceeds of the "loans" Belzner sought from Ms. R.S. and Ms. L.M., as well as the contributions he solicited for the O.C. Tidal Waves basketball team, may have been applied to gambling activity by Belzner.

14

D.      **Belzner's Victimization of Ms. L.J.**

The methodology of Belzner's victimization of Ms. R.S. and Ms. L.M. strikingly echoes that which he employed against a long-time neighbor of his in Selbyville, Ms. L.J., almost all of which occurred in the month preceding Belzner's arrest on March 1, 2012. As detailed in an interview memo prepared by FBI Agent Michael Mahan (**Exhibit 8)**, Ms. L.J. had been Belzner's neighbor at the trailer home he owned near the Delaware shore for five years. Their families enjoyed sharing trips to the beach and holding cook-outs together. Ms. L.J. knew Belzner's two daughters well, and she rode up with Belzner's parents (who live in Selbyville) to attend a school graduation of one daughter in Baltimore.

In February 2012, just prior to his indictment in this case, Belzner told Ms. L.J. that he had finished a construction job, but had received a bad check as payment and needed a short-term loan so that he could meet his payroll and other expenses.[6] Belzner promised Ms. L.J. that he would be able to pay her back within three weeks.

Ms. L.J. was a person of limited means (she worked as a paralegal, earning $33,000 a year), and she did not want to loan Belzner any money. When she told him she did not have the funds he needed, Belzner told her that she could obtain money to lend him by obtaining cash advances on her credit cards, applying for a new credit card and then seeking a cash advance on that, or by seeking loans from banks or short-term

---

[6]   There is every reason to believe that this representation was false. Government counsel has no knowledge of any construction project that Belzner was undertaking in the winter of 2011-12. By that time, Belzner had already become the subject of multiple lawsuits arising out of the exposure and collapse of his ongoing fraud scheme the previous summer.

payday or installment lenders.  Belzner specifically suggested that Ms. L.J. seek a loan

from One Main Financial, one of the same short-term lenders that he subsequently

encouraged Ms. R.S. to use.  He also urged her to get a line of credit from BB&T.

Belzner promised that he would pay all of the fees and interest associated with the loans.

Although she was deeply reluctant to loan the requested funds to Belzner, Ms.

L.J. ultimately did as he asked and loaned him $26,000 during the month of February

2012, just prior to Belzner's indictment in this case on February 29th and his arrest on

March 1st.   She obtained these funds by means of cash advances on various credit cards

and through an $8,000 line of credit from BB&T.  She also agreed to allow Belzner to

charge $3,000 to another of her credit cards to pay for a delivery of oil in order to heat

his residence in Baltimore, and she later loaned him another $1,000 in response to his

request, ostensibly for the purpose of paying electrical bills and other costs associated

with the trailer where Belzner and his family were then living in Selbyville.  Finally, in

early August 2012, Ms. L.J. loaned Belzner $500 to help him get back his Toyota

Sequoia, which had been repossessed.[7]

As her FBI interview memo (**Exhibit 8**) indicates, Belzner has since responded

to Ms. L.J.'s requests for repayment with excuses and promises, but the latter all remain

unfulfilled.  Nor did he keep his promise to pay for the interest charges and fees

resulting from the loans and cash advances she took out on his behalf.  When the FBI

---

[7]  This last transaction was the only one that post-dated Belzner's arrest and the setting of his release conditions, and it appeared plausible to government investigators that Belzner actually did use this $500 for the purpose he stated.  Accordingly, although the government was deeply troubled when it first learned about Belzner's victimization of Ms. L.J. in the fall of 2012, the government did not believe this pre-arrest conduct could support moving to revoke Belzner's pre-trial release.

interviewed her in October 2012, Ms. L.J. was in the process of selling her house because she could no longer afford to pay both her mortgage and the interest charges accumulating on the debts she had incurred on Belzner's behalf.

### E.    Belzner's Past Victimization of Other Neighbors and Friends

As noted above, Belzner's recent victimization of Ms. R.S. and Ms. L.M. is part of a longstanding pattern by him of exploiting and then abusing the trust of individuals who had come to know him as a result of being friends, neighbors, or sports teammates.

During the investigation of Belzner, government agents interviewed Ms. D.V. **Exhibit 9** (FBI Interview Report dated 1/28/13).  Ms. D.V. and her husband got to know Belzner because they all played in the same softball recreation league.  After they had known Belzner for about a year, he approached them about investing in one of his real estate projects.  Belzner told Ms. D.V. and her husband that he was trying to raise money that would enable him to qualify for a larger loan from a bigger company, as well as paying for construction costs.  Belzner told Ms. D.V. and her husband that they could raise the funds necessary to invest with him by getting advances on their credit cards. He assured them that he would cover the interest charges and any other resulting fees, and he promised to pay them back their principal with 25% to 30% interest in only three to four months.  Ms. D.V. and her husband did proceed to take cash advances on a number of credit cards, after which they invested $128,000 with Belzner in November 2008.

Belzner did not repay Ms. D.V. and her husband at the end of the indicated term. For the next three years, until the last time they saw him in December 2011, he

17

continued to make excuses but to insist that the repayment was coming.  He did provide Ms. D.V. and her husband with checks to cover the interest expenses resulting from the advances they had taken, although these checks sometimes bounced.

Government investigators also interviewed Ms. L.H. and her husband (the IRS interview report is attached as **Exhibit 10**), who were next-door neighbors of Belzner's on Widebrook Court in Baltimore County.  Ms. L.H. and her husband had children who were the same age as Belzner's daughters, and for a time, at least, their children attended the same parochial school.  In 2006, Belzner persuaded Ms. L.H. and her husband to take $50,000 that they had just received through a home equity loan and to use it instead to invest with him in real estate.  Belzner promised to repay Ms. L.H. and her husband in one year with 20% interest, and he gave them a promissory note to that effect.  But Belzner failed to repay the investment when its one-year term was up.  Instead, he made sporadic payments to Ms. L.H. and her husband of amounts ranging from $400 to $900.

Despite his failure to repay Ms. L.H. and her husband for the amount they had taken out on their home's line of credit, in the spring of 2008, Belzner managed to persuade Ms. L.H. and her husband to take out credit card advances totaling $200,000 and to give those to him for use in making a down payment on a parcel of land located on Necker Avenue in Perry Hall, Maryland, where Belzner proposed to build 25 town homes.  Once more, Belzner assured them that this would be a short-term transaction and that he would pay them back in the near future.  Once again, no such repayment was forthcoming.  When the federal investigators interviewed Ms. L.H. in the spring of 2011, fully three years later, Ms. L.H. reported that she and her husband "were eventually able

18

to settle with most of the credit card companies using their own money," although her husband's wages were being garnished by some of their creditors.  She reported that Belzner did give them money to cover the sums garnished from her husband's paychecks.

In 2007 and 2008, Belzner also persuaded Ms. L.H. and her husband to purchase at least six other properties, which he said could be flipped for a profit after some work was done on them.  Belzner claimed he was unable to purchase the properties himself because his own funds were tied up in other transactions, but he promised to manage and do the necessary work on the properties, in return for which he would split the profits made with them.  In the end, little if any work was done on these properties by Belzner; he failed to make the mortgage payments on them; and by the time of Ms. L.H.'s interview in 2011, all were either facing foreclosure, in foreclosure, or had been foreclosed upon and sold at a loss.[8]

The investigators asked Ms. L.H. why she was willing to embark upon these other transactions with Belzner after he failed to timely repay their original investment with him in 2006.  She replied that "P. BELZNER was very convincing.  P. BELZNER is a very charismatic/happy/positive person.  He promised the[m] they would get their money back, that he was working on it, and blamed the fact that the economy was bad."  **Exhibit 10** at ¶ 18.

---

[8]   In 2008, Belzner also persuaded Ms. L.H. and her husband to act as straw purchasers to buy back the dream home Belzner was constructing at 11130 Old Carriage Road in Baltimore County when it went into foreclosure.  Belzner made over an LLC he had previously established to Ms. L.H. and her husband, and then arranged to purchase the house at the foreclosure auction in the name of this LLC.  After the purchase, Belzner funded and made the mortgage payments, using funds obtained from other sources.

**ARGUMENT**

**BELZNER'S PRE-TRIAL RELEASE CONDITIONS SHOULD BE REVOKED AND HE SHOULD BE DETAINED PENDING TRIAL, BECAUSE HIS RECENT CONDUCT DEMONSTRATES THAT HE PRESENTS BOTH A PECUNIARY AND A  PHYSICAL DANGER TO THE COMMUNITY**

Belzner's actions over the past four to five months have now resulted in two women of very modest means becoming indebted for a total of approximately $200,000.00.  His actions in regard to Ms. R.S. and Ms. L.M. are strikingly reminiscent of his relatively recent and similar victimization of Ms. L.J. in the weeks just before his indictment – which left her $30,000 in debt, and forced to sell her residence to deal with the interest payments she was obligated to make – as well as his somewhat older treatment of victims like Ms. D.V. and her husband and Ms. L.H. and her husband and family.  His track record demonstrates that Belzner repeatedly approaches people who have come to trust him as a friend or neighbor, persuades them that he needs to borrow money to get through a very short-term cash crunch or to take advantage of an investment opportunity that must be acted upon immediately, then fails to re-pay them as promised and starts a lengthy process of stringing them along with additional promises and excuses.

This pattern of conduct by Belzner is now so well-established that there is no reason whatsoever to believe that he will not continue to leave behind additional financial wreckage if he is allowed to continue to remain at large in society.  The evidence cited above and otherwise developed by the government's investigation demonstrates that for Belzner, committing fraud and wheedling people out of great sums and small is as natural and instinctive as breathing.  The evidence the government

20

will introduce at the trial of this case will establish that during course of committing the fraud scheme detailed in the indictment, Belzner displayed a remarkable capacity to spin out elaborate stories that even experienced real estate developers and investors and investment professionals found to be plausible.  Belzner also has a striking ability to impose his will on others against their better judgment, as the fates of his former business partner Brian McCloskey, the settlement attorney Kevin Sniffen, and Ms. L.J.'s account all  demonstrate.  And as the examples of Ms. R.S., Ms. L.M., Ms. L.J.., and Ms. D.V. and Ms. L.H. and their spouses demonstrate, when Belzner is turned loose on persons who are not sophisticated about money, investments, or business, and who moreover already trust and like him as a result of a personal acquaintance, the results can be financially devastating – leaving his victims under a cloud of debt and destroyed credit from which it will take them years to recover, if indeed they are ever able to do so.

Moreover, the information supplied by Ms. R.S. and Ms. L.M. demonstrates that Belzner constitutes not merely a pecuniary danger to society, but a physical one as well.  Based upon their accounts, his drinking – which has been a serious problem for years[9] – appears to be completely out of control.  A history of chronic alcohol abuse plainly presents a serious danger to the community, as the Fifth Circuit recognized in upholding

---

[9]   Court records indicate that Belzner has been charged with driving under the influence at least once, and Belzner's probation officer has advised us that his probation was extended because of a DUI incident.  Government investigators were also advised by Ms. T.S., a former employee of the McCloskey Group during the time Belzner was working there, that Belzner had been required to have his car equipped with a breathalyzer ignition interlock device, which prevented him from starting the car if he was intoxicated.  However, Belzner got around this requirement by buying a new vehicle, and then only driving the car equipped with the breathalyzer device when he needed to get its mileage up in advance of a meeting with his probation officer.  **Exhibit 11** (documents related to Belzner's drinking issues).

a revocation and detention order in the case of a defendant with a past track record of alcohol abuse where he had traveled outside the range of his electronic home monitoring device to conduct a meeting at a restaurant where alcohol was served. *United States v. Minor*, 2006 WL 3219702, at **1 (5th Cir. Nov. 6, 2006) (unpublished).

The procedures for dealing with defendants who have committed another federal, state or local crime, or who have violated another condition of pre-trial release, are set forth in 18 U.S.C. § 3148. Once the government initiates a proceeding for revocation of an order of pre-trial release, the Court may issue an arrest warrant and must set the matter in for a hearing. 18 U.S.C. § 3142(b). Following that hearing, the Court "shall enter an order of revocation and detention" if the Court finds that:

- there is probable cause to believe the defendant committed a Federal, State or local crime while on release, and/or

- there is clear and convincing evidence that the defendant violated any other condition of release, *provided that* the Court also finds that

  (I)  based upon the factors set forth in § 3142(g), there is no condition or combination of conditions that will ensure that the defendant does not flee or pose a danger to the safety of any other person or the community, *or*

  (ii)  the person is unlikely to abide by any condition or combination of conditions of release.

18 U.S.C. § 3148(b)((1) & (2).

Here, the government submits that the evidence attached to this motion is more than sufficient to establish probable cause to believe that defendant Belzner has committed other federal and/or state crimes while on release, including mail and wire fraud, identity theft, and theft by means of false pretenses. To establish probable cause,

the Court must merely find that the facts available would warrant a person of reasonable caution to believe that the defendant committed a crime while on release.  *United States v. Gotti*, 794 F.2d 773, 777 (2nd Cir. 1986); *United States v. Cook*, 880 F.2d 1158, 1160 (10th Cir. 1989).  The government is required to show only that there is a fair probability that the defendant committed another crime, not a substantial probability, nor must it make out a *prima facie* case of guilt, much less a showing that his or her guilt is more likely than not.  *Illinois v. Gates*, 462 U.S. 213, 232 (1983); *United States v. Burch*, 1996 WL 172968, at *6 (D. Kan. March 19, 1996).

The government further submits that the information supplied by Ms. R.S. and L.M. will prove sufficient to establish by clear and convincing evidence that Belzner has violated his pre-trial release condition that he refrain from excessive use of alcohol.[10]

Under § 3148(b), if there is probable cause to believe that the defendant has committed additional federal, state, or local crimes while on pre-trial release, then a rebuttable presumption arises that no condition or combination of conditions will assure that he or she will not pose a danger to the safety of any other person or the community.  The burden of production then shifts to the defendant to produce at least

---

[10]   Violations of release conditions far less serious than either of those committed by defendant Belzner have resulted in orders of revocation and detention.  *See, e.g., United States v. Minor*, 2006 WL 3219702, at **1 (5th Cir. Nov. 6, 2006) (unpublished) (defendant's pre-trial release was revoked, and he was detained, after he twice traveled beyond the range of his electronic home monitoring device); *United States v. Barber*, 2013 WL 3580195 (W.D. Ark.  July 12, 2013) (unpublished) (defendant's pre-trial release revoked and detention order issued after he repeatedly violated his home detention by dining out in restaurants or wine bars);  *United States v. Steiner*, 2012 WL 234097, at *2 (S.D. Fla. Jan. 24, 2012) (unpublished) (defendant's bond was revoked and he was detained after he violated his release conditions by repeatedly traveling from his Fort Lauderdale residence to his girlfriend's residences in Fort Myers and Palm Beach, which were outside the judicial district, without authorization).

some evidence rebutting the presumption and supplying reason to believe that detention

is not necessary to prevent him or her from engaging in criminal conduct to the

detriment of the community. *Cook*, 880 F.2d at 1161-62; *Burch*, 1996 WL 172968, at *7.

Once the Court finds that there is probable cause to believe the defendant

committed a crime while on release and/or that there is clear and convincing evidence

that the defendant violated some other release condition, then only a preponderance of

the evidence is required to establish that no condition or combination of conditions will

assure that the defendant does not pose an economic or pecuniary danger to the

community, or that he or she is unlikely to abide by any condition or combination of

conditions of release. *United States v. Aron*, 904 F.2d 221, 224 (5th Cir. 1990); *Gotti*,

794 F.2d at 777-78; *Burch*, 1996 WL 172968, at *7.[11]

Some courts have held that in making an initial release decision, only violent

offenses, certain narcotics crimes, crimes authorizing maximum sentences of life

imprisonment or death, or crimes involving minor children or the possession of a

firearm or explosive device can serve as a basis for detention based upon dangerousness,

since those are the only offenses expressly enumerated in § 3142(f)(1). *United States v.*

*Ploof*, 851 F.2d 7 (1st Cir. 1988); *United States v. Friedman*, 837 F.2d 48 (2d Cir. 1988);

*United States v. Himler*, 797 F.2d 156 (3d Cir. 1986); *United States v. Debeir*, 16 F.

Supp.2d 592, 594-95 (D. Md. 1998). But the Court's consideration of a motion to revoke

a defendant's conditions of pre-trial release proceeds under § 3148, which is structured

---

[11]   This is a substantially lower burden than the government is required to meet
in the initial release hearing context, where clear and convincing evidence is required.
*Id.*

differently than § 3142 and which turns upon standards of proof that are far more favorable to the government.  *United States v. Gill*, 2008 WL 2120069, at *1 -*2 (E.D. Cal. 2008); *United States v. McKethan*, 602 F. Supp. 719, 722 (D.D.C. 1985) (noting that "Sections 3142 and 3148 provide quite different avenues to detention pending trial," and characterizing the process of making detention decisions under § 3148 as "notably dissimilar" from that under § 3142).

In particular, § 3142(f)(1), which some courts have read as a limitation on the types of dangerousness that can be considered in the initial release context, plays no part in resolving motions to revoke conditions of release under § 3148.  *United States v. Mackie*, 876 F. Supp. 1489, 1491 (E.D. La. 1994) ("Section 3148 does not require reference to the factors in § 3142(f).  Indeed, the only factors referenced in § 3148 are those listed in § 3142(g).").  Thus, "[u]nlike § 3142, there is no limitation in § 3148(b) regarding the types or categories of Federal, State or local crimes that will support an order revoking pre-trial release."  *United States v. Soria*, 2011 WL 3651272, at *6 (D. Nev. Aug, 17, 2011) (unpublished).

Section  3148(b)(2)(A), which sets forth one of the two circumstances that trigger mandatory detention under § 3148, provides that the Court should look to the factors cited in § 3142(g) in determining whether any conditions of release will ensure that the defendant does not present a danger to the community.  And the factors cited in § 3142(g) specifically include the defendant's character, past conduct, whether he or she was on probation at the time the current charged offenses were committed (as Belzner was), and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  And it is well-established that the phrases

"safety of the community" or "danger to the community" – both of which are used in §

3148 – encompass more than merely acts of physical violence.

This language was drawn from the previous federal post-conviction bail statute

(the prior 18 U.S.C. § 3148) passed in 1966.  In applying that statute, the courts had

consistently recognized that this language encompassed not only physical violence, but

also economic harms.  Judges found that defendants constituted a "danger to the

community" under the old § 3148 where they "operated as a confidence man over a

period of years," *United States v. Louie*, 289 F. Supp. 850 (N.D. Cal. 1968); engaged in

labor union corruption, *United States v. Provenzano*, 605 F.2d 85 (3d Cir. 1979);

refused to file tax returns, *United States v. Karmann*, 471 F. Supp. 1021 (C.D. Cal. 1979);

carried out a fraudulent check-cashing scheme while on parole for another offense,

*United States v. Moss*, 522 F. Supp. 1033 (E.D. Pa. 1981); or misappropriated public

funds and the services of public employees.  *United States v. Parr*, 399 F. Supp. 883

(W.D. Tex. 1975).  These authorities clearly informed the explanation of this phrase's

meaning in the statute's legislative history when it was passed in 1984.

The legislative history to the 1984 Bail Reform Act, of which the current § 3148

was a part, clearly spelled out the intended meaning of the phrase "safety of any other

person or the community":

> . . . the language referring to the safety of the community refers to the
> danger that the defendant might engage in criminal activity to the
> detriment of the community.  The Committee intends that the concern
> about safety be given a broader construction than merely danger of harm
> involving physical violence.

S. REP. NO. 225, 98TH CONG., 2D SESS., at 12-13, *reprinted in* U.S. CODE CONG. & ADM.

NEWS 3187, 3195-96 (1984).

Since the BRA was enacted in 1984, the Ninth Circuit has held that danger to the community "may, at least in some cases, encompass pecuniary or economic harm," *United States v. Reynolds*, 956 F.2d 192 (9th Cir. 1992), and a panel of the Second Circuit has likewise recently suggested in an unpublished decision in a celebrated case that courts may appropriately consider whether a defendant constitutes a danger to the pecuniary safety of another person or the community in making post-conviction release decisions. *United States v. Madoff*, 2009 WL 728379, at **1 (2nd Cir. Mar. 20, 2009) (unpublished). The Federal Judicial Center's 1993 monograph on the BRA (at pages 11-12) similarly follows the statute's legislative history in stating squarely that "Defendants may be detained because of the risk of danger to the community even where there is no showing that they are likely to engage in physical violence." A number of lower courts have likewise found that a defendant posed a danger to the community based upon evidence that they were likely to commit economic crimes, or had done so while on pre-trial release. *See, e.g., United States v. Wittig*, 2007 WL 470705 (D. Kan. Feb. 8, 2007) (unpublished) (noting that defendant's bond was previously revoked because the Court considered him an economic danger to the community); *United States v. Lawson*, Crim. No. RWT-05-0304 (D. Md. Oct. 31, 2005) (defendant's pre-trial release in fraud case was revoked and she was ordered detained after picking up additional fraud charges); *United States v. Kerns*, 2003 U.S. Dist. LEXIS 26570 (S.D. Fla. Nov. 7, 2003) (unpublished) (detaining defendant accused of stock fraud scheme who had a history of fraudulent criminal activity based in part on economic dangerousness); *United States v. Morales*, Crim. No. 03-00085-SS (W.D.Tex. June 26, 2003) (defendant's bond revoked after court found probable cause to believe that he had lied on two car loan applications

while on pre-trial release) (relevant papers attached as **Exhibit 12**); *United States v. Ruedlinger*, 1997 WL 445819, at *4 (D.Kan. 1997) ("an economic danger to the community is clearly an appropriate basis to deny defendant's request for post-conviction release"); *United States v. Shareef*, 907 F. Supp. 1481, 1486 (D. Kan. 1995) (ordering a defendant detained on both risk of flight and dangerousness grounds where he continued to engage in fraudulent activity while on bond on previous charges: "Even though the danger to the community is economic only, the probability of such danger is also significant."); *Mackie*, 876 F.Supp. at 1491 (revoking defendant's bond and ordering him detained because there was probable cause to believe that he committed additional fraud offenses while on pre-trial release, and specifically noting that "The Court also believes that the term 'safety of the community' as used in § 3148 refers not only to the mere danger of physical violence, but also to the danger that the defendant might engage in criminal activity to the detriment of the community."); *United States v. Masters*, 730 F. Supp. 686, 689 (W.D.N.C. 1990) (detaining a defendant convicted of selling bogus tax shelters post-trial because he was "an unrepentant con-artist").

When a defendant has compiled the track record of fraudulent deception and financial devastation that Belzner has – first in the years leading up to these charges, and then in the period since he has been on pre-trial release in this case – and, moreover, where he has repeatedly violated the release condition that he refrain from excessive consumption of alcohol, he has forfeited any right to remain free. Belzner's pre-trial release should therefore be revoked and he should be detained pending trial.

28

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should issue a warrant for Belzner's arrest and then set in this matter for a hearing to determine whether he has violated his conditions of pre-trial release that (1) he not violate any federal, state or local laws and (2) that he refrain from excessive use of alcohol, and whether he should be detained pending the trial of this matter.    An Arrest Warrant is attached.

Respectfully submitted,

ROD J. ROSENSTEIN
UNITED STATES ATTORNEY

/s/

By: _____
Jefferson M. Gray
Kathleen O. Gavin
Assistant United States Attorneys

U.S. Attorney's Office
36 South Charles Street
Fourth Floor
Baltimore, Maryland 21201
(410) 209-4915

Date: August 12, 2013

AO 442 (Rev. 11/11) Arrest Warrant

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

United States of America
v.

)
)
)
)
)
)

Case No.

_____
*Defendant*

## ARREST WARRANT

To:    Any authorized law enforcement officer

      **YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)* _____ ,

who is accused of an offense or violation based on the following document filed with the court:

❏ Indictment    ❏ Superseding Indictment    ❏ Information    ❏ Superseding Information    ❏ Complaint
❏ Probation Violation Petition    ❏ Supervised Release Violation Petition    ❏ Violation Notice    ❏ Order of the Court

This offense is briefly described as follows:

Date: _____

_____
*Issuing officer's signature*

City and state: _____

_____
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ . |

Date: _____

_____
*Arresting officer's signature*

_____
*Printed name and title*

AO 442  (Rev. 11/11)  Arrest Warrant (Page 2)

**This second page contains personal identifiers provided for law-enforcement use only
and therefore should not be filed in court with the executed warrant unless under seal.**

*(Not for Public Disclosure)*

Name of defendant/offender: _____

Known aliases: _____

Last known residence: _____

Prior addresses to which defendant/offender may still have ties: _____

_____

Last known employment: _____

Last known telephone numbers: _____

Place of birth: _____

Date of birth: _____

Social Security number: _____

Height: _____    Weight: _____

Sex: _____    Race: _____

Hair: _____    Eyes: _____

Scars, tattoos, other distinguishing marks: _____

_____

History of violence, weapons, drug use: _____

_____

Known family, friends, and other associates *(name, relation, address, phone number)*: _____

_____

FBI number: _____

Complete description of auto: _____

_____

Investigative agency and address: _____

_____

Name and telephone numbers (office and cell) of pretrial services or probation officer *(if applicable)*: _____

_____

Date of last contact with pretrial services or probation officer *(if applicable)*: _____

_____

**<u>EXHIBIT LIST</u>**

| <u>Exhibit Number</u> | <u>Description</u> |
|---|---|
| 1 | Delaware and Federal Criminal Laws Applicable to Belzner's Conduct |
| 2 | Final Pre-Trial Release Order in *United States v. Patrick Belzner* |
| 3 | FBI Interview Report relating to Ms. R.S. |
| 4 | FBI Interview Report relating to Mr. M.S. |
| 5 | IRS Interview Reports relating to Ms. L.M. |
| 6 | Records relating to credit cards that Patrick Belzner obtained using Ms. L.M.'s personal identifiers |
| 7 | Records from Taylor Bank relating to the O.C. Tidal Waves |
| 8 | FBI Interview Report relating to Ms. L.J. |
| 9 | FBI Interview Report relating to Ms. D.V. |
| 10 | IRS Interview Report relating to Ms. L.H. |
| 11 | Materials relating to Belzner's drinking issues |
| 12 | Documents relating to *U.S. v. Morales* |