

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2013 OCT -9 A II: 12

CLERK'S OFFICE
AT BALTIMORE

BY_____ DEPUTY

JMG/KOG: USAO# 2011R00629

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| PATRICK J. BELZNER, | ) |
| a/k/a "Patrick McCloskey," | ) |
| MERVYN A. PHELAN, SR., | ) |
| and | ) |
| GREGORY E. GRANTHAM, | ) |
| | ) |
| *Defendants.* | ) |

CRIMINAL NO. ~~JKB-12-0103~~

(Wire Fraud Conspiracy, 18 U.S.C.
§ 1349; Wire Fraud, 18 U.S.C. §
1343; Obstruction of Justice, 18
U.S.C. § 1503; Tax Evasion, 26
U.S.C. § 7201; Aiding and
Abetting and Causing an Act to be
Done, 18 U.S.C. § 2; Forfeiture,
18 U.S.C. § 981)

### SUPERSEDING INDICTMENT

The Grand Jury for the District of Maryland charges that:

### COUNT ONE

### (Conspiracy to Commit Wire Fraud)

### The Conspirators and Related Entities

At all times relevant to this Indictment:

1.     Defendant **PATRICK J. BELZNER** was a Maryland resident. From approximately late 2008 through August 2011, **BELZNER** was employed by a real estate development business located in Baltimore County known as the McCloskey Group, LLC.

2.     Brian McCloskey, a Maryland resident, operated the McCloskey Group, LLC, a real estate construction and development business.   McCloskey incorporated and became the owner of several other limited liability companies (LLCs), including 1100

1

Columbia York PA, LLC and Claire's Lane LLC.    All three of these LLCs will be collectively referred to in this Indictment as "the McCloskey Group."    The McCloskey Group primarily engaged in building houses, remodeling homes and managing rental properties.

3.    Kevin Sniffen was an attorney licensed to practice law in the State of Maryland who worked in real estate and related commercial transactions.    As part of his work, Sniffen often served as the attorney or agent for escrow accounts that were created to hold funds in trust in connection with commercial transactions, including real estate transactions.    As an escrow agent, Sniffen was responsible for maintaining the security of the funds and ensuring that they were released to the appropriate party only upon the fulfillment of conditions previously agreed to by the parties.    Until about May 2009, Sniffen worked for a title company known as Sage Title Group, LLC.    Sniffen lost his position with Sage Title in May 2009 and thereafter was employed at Covenant Title Corporation.

4.    Defendant **MERVYN A. PHELAN, SR.** was a resident of California who worked as a loan broker.    Beginning in or about 2009, **PHELAN** began operating a small company called IAG Underwriters, LLC (IAGU) that maintained an office in Newport Beach, California.    IAGU was in the business of locating project financing and performing the underwriting on loan applications submitted by real estate developers. Because IAGU lacked the necessary capital to make substantial loans itself, IAGU sought to identify and work with other lenders who would be willing to act as "participants" in financing real estate development projects for which IAGU had performed the underwriting.    While **PHELAN** variously used the title of "Chief Underwriter" or

"Senior Underwriter" in correspondence and in e-mail communications with outsiders, he was effectively IAGU's chief decision maker.

5.      Defendant **GREGORY E. GRANTHAM** was an attorney licensed to practice law in the State of California.   **GRANTHAM** was IAGU's General Counsel, and also conducted a private legal practice.

6.      Sean Krondak held the title of "Vice President - Loan Officer Credit & Underwriting" and performed administrative and underwriting functions for IAGU. **PHELAN, GRANTHAM,** and Krondak were usually the only three full-time employees of IAGU.

7.      **PHELAN, GRANTHAM,** and Krondak were also associated with several other companies – some of which were little more than shell corporations or holding companies -- whose names sometimes appeared on letterheads that they used.   Among these were Insurance Annuity Group (IAG) and Teachers Annuity Group (TAG).   In addition, during much of the time period relevant here, **PHELAN** was involved in the efforts of various individuals to acquire Workmen's Life Insurance Company (Workmen's Life), a California company that held insurance licenses in Arizona and California, but that had not been active since the 1970's.   **PHELAN** believed that Workmen's Life or TAG could be used to acquire a large portfolio of retired teachers' annuity plans, which could then provide financing for real estate development loans brokered by IAGU.   Although the funds necessary for the purchase of Workmen's Life were tendered in several installments in the summer and fall of 2010, the purchase of the company and the final transfer of its ownership and licenses was not completed until December 2011.   A shell company named Preferred Senior Holding, LLC (PSH) was

3

incorporated in Connecticut to serve as a holding company for Workmen's Life, and **PHELAN** and Krondak controlled a bank account established in its name at Wells Fargo Bank.

## THE CONSPIRACY AND THE SCHEME AND ARTIFICE TO DEFRAUD

### The Charge

8.     From in or about the fall of 2009, and continuing thereafter until in or about August 2011, in the District of Maryland and elsewhere, the defendants

**PATRICK J. BELZNER,**
**a/k/a "Patrick McCloskey,"**
**MERVYN A. PHELAN, SR.,**
**and**
**GREGORY E. GRANTHAM,**

together with Brian McCloskey, Kevin Sniffen, and others known and unknown to the Grand Jury, did knowingly and willfully conspire, confederate, and agree to commit wire fraud in violation of 18 U.S.C. § 1343, that is, to knowingly and willfully devise and intend to devise a scheme and artifice to defraud investors, including Mr. R.R., Mr. S.G., Mr. G.C., Mr. B.L., Mr. T.S., Mr. G.T., and various businesses and investment entities that they owned or controlled, as well as a real estate developer named Mr. E.M., and to obtain money and property by means of materially false and fraudulent pretenses, representations, and material omissions, and for the purpose of executing and attempting to execute the scheme to defraud, did transmit and cause to be transmitted by means of wire and radio communication in interstate commerce, writings, signs, signals, pictures, and sounds.

4

### The Purposes of the Wire Fraud Conspiracy
### and the Scheme and Artifice to Defraud

9.      It was a purpose of the wire fraud conspiracy and the scheme and artifice to

defraud that **BELZNER** and McCloskey stole more than $22 million that they

persuaded investors to place in supposedly secure escrow accounts in connection with

real estate development projects.

10.      Another purpose of the wire fraud conspiracy and the scheme and artifice

to defraud was to cover up the thefts of investor and client funds by **BELZNER** and

McCloskey, and to make false representations to the victim investors and their attorneys

in order to buy time and lull the victims into believing they would be paid back.

11.      A further purpose of the wire fraud conspiracy and the scheme and artifice

to defraud was to enable **PHELAN** and **GRANTHAM** to obtain payments from the

McCloskey Group to fund the continuing operations of IAGU and its related entities,

including the payment of salaries to **PHELAN** and **GRANTHAM;** to enable **PHELAN**

to make lease payments he owed on his residence in Newport Beach; and to obtain funds

from McCloskey with which to acquire Workmen's Life.

### Manner and Means of the Wire Fraud Conspiracy
### and the Scheme and Artifice to Defraud

12.      It was a part of the wire fraud conspiracy and the scheme and artifice to

defraud that **BELZNER** and McCloskey would inform prospective investors that IAGU,

from whom they were seeking project financing, required the McCloskey Group to show

that it had a specified amount of "liquidity" or cash reserves on deposit with a bank in an

escrow account as part of the loan approval process.

5

13.     It was further a part of the wire fraud conspiracy and the scheme and artifice to defraud that **BELZNER** and McCloskey would promise to pay prospective investors high rates of interest for the use of their funds for a limited period of time.

14.     It was further a part of the wire fraud conspiracy and the scheme and artifice to defraud that **BELZNER** and McCloskey would promise prospective investors that if they placed funds in an escrow account to enable the McCloskey Group to satisfy this "liquidity" requirement, the escrowed funds would at all times remain the sole and exclusive property of the investor, and neither **BELZNER**, McCloskey, nor the McCloskey Group would have any right, title, claim, or interest in the funds or any ability to access, use or remove the funds without the permission of the investor.

15.     It was further a part of the wire fraud conspiracy and the scheme and artifice to defraud that **BELZNER** and McCloskey would assure prospective investors that the security of the escrowed funds would be guaranteed by placing the escrow account under the control of Kevin Sniffen, Esq., a licensed attorney and escrow agent.

16.     It was further a part of the wire fraud conspiracy and the scheme and artifice to defraud that **BELZNER,** McCloskey, **PHELAN** and **GRANTHAM** informed Mr. E.M., a real estate developer who was seeking project financing from IAGU for the construction of hotels on a parcel of land near Bowie, Maryland, that it was necessary for him to show "liquidity" by placing more than $1 million in an escrow account that would likewise be under the control of attorney Sniffen.

17.     It was further a part of the wire fraud conspiracy and the scheme and artifice to defraud that **BELZNER, PHELAN, GRANTHAM** and Sniffen represented to Mr. E.M. that if he placed the funds in escrow with Sniffen, Mr. E.M.'s company would

6

retain title to the funds and attorney Sniffen would ensure that the funds were not disbursed or improperly accessed.

18.    It was further a part of the wire fraud conspiracy and the scheme and artifice to defraud that when prospective investors or their attorneys asked whether someone other than Sniffen could serve as the escrow agent, **GRANTHAM** and Sniffen would falsely advise them that Sniffen had undergone an extensive review process with IAGU before being approved by the company to be its authorized agent.

19.    It was further a part of the wire fraud conspiracy and the scheme and artifice to defraud that **BELZNER** would falsely tell escrow account investors, as well as their attorneys, that his name was "Patrick McCloskey."   At other times, he would state that he was a brother or other relative of Brian McCloskey.   By hiding his real name, **BELZNER** made it more difficult for the investors or their counsel to discover derogatory and material information about him that might have caused prospective investors or others like Mr. E.M. to have reservations about doing business with **BELZNER.**

20.    It was further a part of the wire fraud conspiracy and the scheme and artifice to defraud that **BELZNER** reminded **PHELAN** that he should remember that Mr. B.L. believed his name was "Patrick McCloskey," not Patrick Belzner, and that he was Brian McCloskey's brother.

21.    It was further a part of the wire fraud conspiracy and the scheme and artifice to defraud that Sniffen would not maintain the security of the funds entrusted to his care as the escrow agent, but instead would repeatedly allow **BELZNER** and McCloskey to access the escrow accounts and to remove and use the escrowed funds that

7

had been tendered by the investors or lenders or Mr. E.M. for their own purposes.

22.    It was further a part of the wire fraud conspiracy and the scheme and artifice to defraud that **BELZNER** and McCloskey would remove virtually all of the funds held in the escrow accounts within a very short period after they were deposited, sometimes executing transfers and withdrawals on the very day the funds were deposited.

23.    It was further a part of the wire fraud conspiracy and the scheme and artifice to defraud that **BELZNER** and McCloskey used the stolen funds to enrich themselves, to make "extension" payments to prior investors, to finance the ongoing operations of the McCloskey Group, and to pay off other pre-existing business and personal debts.

24.    It was further a part of the wire fraud conspiracy and the scheme and artifice to defraud that in order to conceal the thefts of the escrowed funds and to discourage investors and Mr. E.M. from pressing for the return of their escrowed funds, **BELZNER, PHELAN** and **GRANTHAM** and their co-conspirators would use a variety of deceptive and fraudulent practices-which included, but were not limited to, the following:

(a)    using e-mail and interstate telephone calls to make false representations to investors and to Mr. E.M. regarding the continued retention of the funds in the escrow accounts, the status of the pending loan transactions that the escrowed accounts were intended to facilitate, the dates those loan transactions were

8

expected or scheduled to close, and the dates when the money supposedly being held in the escrow accounts would be returned to the investors and to Mr. E.M.;

(b)   using e-mail communications and faxes to transmit fabricated bank statements to investors and Mr. E.M., which misrepresented the balances on deposit in the escrow accounts;

(c)   issuing worthless checks on an account in the name of PSH and transmitting those from California to Maryland;

(d)   depositing worthless checks into an escrow account and thereby generating a temporarily inflated account balance, which would be used to satisfy an investor who sought confirmation that his invested funds remained on deposit;

(e)   falsely representing that either IAGU or PSH had received the funds from Sniffen's account and was now acting as the escrow agent;

(f)   falsely representing that IAGU had obtained commitments from "participants" to provide financing for various real estate construction projects;

(g)   falsely representing that closings on previously promised loan transactions were imminent;

(h)   falsely representing that previously promised closing dates on various loans had been held up by various fictitious complications; and

(i)   concealing the scheme by using funds fraudulently obtained from more recent investors or Mr. E.M. to pay previous victims of the defendants' escrow account fraud scheme, thereby lulling the victims into believing that their money was safe.

25.    It was further a part of the wire fraud conspiracy and the scheme and artifice to defraud that **BELZNER** would prepare fraudulent "scripts" for **PHELAN** and **GRANTHAM** to use in connection with expected telephone conversations or in written communications to escrow account investors and Mr. E.M., and to their respective attorneys.   These "scripts" sought to lull the lenders, investors, and Mr. E.M. into not pursuing demands for, or taking action to compel, the return of the funds they had placed in the escrow accounts.

26.    As a result of the wire fraud conspiracy and the scheme and artifice to defraud outlined above, **BELZNER**, McCloskey, and Sniffen caused in excess of $22 million to be wired or obtained from the bank accounts of investors, lenders, and Mr. E.M. into what were represented to be escrow accounts.   These funds were subsequently stolen by **BELZNER** and McCloskey through the means described above.   **BELZNER**, McCloskey, **PHELAN, GRANTHAM** and the other conspirators then worked together to dissuade the investors and Mr. E.M. from pressing for the return of their funds or otherwise acting on their available remedies.

18 U.S.C. § 1349

## COUNTS TWO THROUGH TEN

### (Wire Fraud)

1.       The allegations of paragraphs 1 through 7 and 9 through 26 of Count One are realleged and incorporated here.

### The Escrow Fraud Against Mr. R.R. (April 2009 - July 2011)

2.       Mr. R.R. was the owner of a successful business who provided loans with terms of three years or less to other businessmen.   One of the businessmen to whom Mr. R.R. periodically loaned money was Brian McCloskey.

3.       In or about March 2009, **PHELAN**, who was then working for a business named WMCI Financial, successfully brokered an approximately $1.3 million loan to assist the McCloskey Group in purchasing a parcel of land located at 1100 Columbia Avenue in York, Pennsylvania.   Mr. R.R. loaned cash to the McCloskey Group to help it pay for the closing costs when this transaction went to settlement.

4.       In or about April 2009, **BELZNER** and McCloskey told Mr. R.R. that they were seeking a substantial loan from the U.S. Department of Housing and Urban Development (HUD) for the purpose of constructing a senior citizens apartment complex on the 1100 Columbia Avenue York parcel (hereafter "the York project"). McCloskey further told Mr. R.R. that **PHELAN**, who was attempting to obtain the HUD financing for the York project, had said that in order to obtain this loan, the McCloskey Group must place substantial funds in an escrow account in order to establish that it had "liquidity."   **BELZNER** and McCloskey represented to Mr. R.R. that these funds would remain in the escrow account and would only be used for the purpose of meeting the

11

liquidity requirement for the HUD loan.   Mr. R.R. further understood that the escrow account would remain under the control of Kevin Sniffen, Esq., an attorney with the Sage Title Group.   Mr. R.R. agreed to supply the funds.

5.   On or about the dates shown below, Mr. R.R. caused approximately $2.42 million in the form of three cashier's checks to be deposited into an account ending in # 1859 belonging to the Sage Title Group at Wachovia Bank.   Mr. R.R. understood that these funds would be used to satisfy the liquidity requirements for loans sought by the McCloskey Group and brokered by **PHELAN** in connection with the York project and another project known as Claire's Lane:

- April 13, 2009:   $1,500,000   [York Project]
- April 20, 2009:   $  220,000   [Claire's Lane]
- April 29, 2009:   $  700,000   [Claire's Lane]

6.   **BELZNER** and McCloskey subsequently caused these funds to be removed from the escrow account, and then used them to pay other creditors of theirs. Mr. R.R. was unaware that **BELZNER** and McCloskey had removed his funds from this account and used them for unauthorized purposes.

7.   In or about August 2009, **BELZNER** and McCloskey told Mr. R.R. that they needed to deposit an additional $1.535 million into another escrow account as part of their ongoing efforts to obtain the financing from HUD.   Once again, **BELZNER** and McCloskey represented to Mr. R.R. that these funds would remain in the escrow account. Mr. R.R. agreed to provide the requested funds, and on August 11, 2009, he caused $1.535 million to be wired from his bank account # 0994 at Carrollton Bank to an escrow account ending in # 0575 maintained at Wachovia Bank by Kevin Sniffen (who by that time was no longer employed by the Sage Title Group).   **BELZNER** and McCloskey

12

supplied Mr. R.R. with a promissory note in the amount of $1.735 million as security for the return of his principal and interest on this transaction.

8.    Between August 11, 2009 and the end of that month, **BELZNER** and McCloskey removed the $1.535 million that Mr. R.R. had transmitted to account # 0575 and used these funds to pay existing creditors, business and personal expenses.   Mr. R.R. was unaware that **BELZNER** and McCloskey had removed his funds from this account and used them for unauthorized purposes.

9.    Beginning in or about August 2010, Mr. R.R., dissatisfied at the lack of progress in obtaining financing on the York, Claire's Lane, and Estates of McCormick projects for which he had loaned money, began pressing **BELZNER** and McCloskey for the return of his escrow funds.   Mr. R.R. also demanded that Sniffen sign a letter that reaffirmed that he was still holding $2.7 million and $2.1 million respectively in two separate escrow accounts which "are the property of [R.R.] and can only be dispersed [*sic*] at his direction."   Sniffen authorized McCloskey to sign the letter for him.

10.    In or about November or December 2010, Mr. R.B., another attorney representing Mr. R.R, requested a meeting with **BELZNER** and McCloskey.   At this meeting, McCloskey assured Mr. R.B. that his client's funds were still being securely maintained in Kevin Sniffen's escrow accounts and at that point had a balance totaling $4.5 million.   Mr. R.B. advised **BELZNER** and McCloskey that he wanted to consolidate all the previous escrow transactions and related documentation. Subsequently, a fraudulent Wachovia Bank statement was faxed from the McCloskey

13

Group to Mr. R.R. reflecting that $4.5 million was on deposit in an escrow account ending in # 4719 at Wachovia Bank on December 2, 2010.

11.    On or about December 2, 2010, **GRANTHAM** prepared and sent by e-mail to McCloskey, with a copy to his attorney R.B., a letter representing that IAGU's "underwriting guidelines" required that prospective borrowers must "demonstrate sufficient reserves," which were to be placed "with an IAGU approved closing attorney to be held until actual closing occurs.   Kevin Sniffen, Esq. has been approved by IAGU in this regard."   **GRANTHAM's** letter further stated that the required amount of reserves for the three loans IAGU was then processing for the McCloskey Group totaled $4.474 million.

12.    In or about the latter part of January or early February 2011, McCloskey executed an Amended Irrevocable Assignment Agreement prepared by attorney R.B. relating to Mr. R.R.'s escrow funds which again affirmed that Sniffen was then holding $4.5 million belonging to Mr. R.R. in an escrow account at Wachovia Bank, which McCloskey knew was not true.

13.    On or about February 11, 2011, **GRANTHAM** prepared a letter addressed to McCloskey, with a copy to attorney R.B., falsely representing that three loans brokered by IAGU to various McCloskey Group entities in the amounts of $1.775 million, $3.14 million, and $1.5 million were scheduled to close on February 23rd, February 28th, and in March 2011 respectively, so that the escrow funds could thereafter be returned to Mr. RR.   In fact, IAGU had no funding or agreed participants for any of the three loans as of that date.   **GRANTHAM** first transmitted this letter by e-mail to **BELZNER,** McCloskey and **PHELAN** for their review, and then sent it by e-mail to attorney R.B.

14

14.   No closings of loans brokered by IAGU to any of the McCloskey entities took place on the dates indicated in **GRANTHAM's** February 11th letter, or at any time thereafter.   Instead, for the remainder of the spring and into the summer of 2011, **BELZNER**, McCloskey, Sniffen, **GRANTHAM,** and **PHELAN** continued to provide false and fraudulent excuses and explanations to attorney R.B. as to why the settlements had not occurred, coupled with further deceptive assurances that the settlements were imminent.

15.   On or about July 14, 2011, attorney R.B. filed confessed judgments totaling in excess of $11 million against McCloskey, the McCloskey Group, and various McCloskey-related entities, which included the $4.5 million that was supposedly being held for Mr. R.R. in the Kevin Sniffen escrow account # 4719 at Wachovia Bank.   In fact, that account contained $33.48 as of June 30, 2011.   Mr. R.R. lost the entire $3.955 million that he made available as escrow funds between April 13 and August 11, 2009 to support the McCloskey Group's efforts to obtain financing for its projects through IAGU.

## Executions of the Scheme and Artifice to Defraud

16.   On or about the dates indicated below, in the District of Maryland and elsewhere, the defendants

**PATRICK J. BELZNER,**
**a/k/a "Patrick McCloskey,"**
**MERVYN A. PHELAN,   SR.,**
**and**
**GREGORY E. GRANTHAM,**

together with Brian McCloskey, Kevin Sniffen, and others known and unknown to the Grand Jury, for the purpose of executing the scheme and artifice to defraud, and

15

attempting to do so, knowingly and willfully caused to be transmitted in interstate commerce by means of wire communication certain signs and signals, to wit, the transmissions set forth below:

| COUNT | DESCRIPTION OF WIRE TRANSMISSION |
|---|---|
| 2 | Wire transfer on August 11, 2009 in the amount of $1.535 million from account # xx-xxx0994 in the name of Mr. R.R. at Carrollton Bank in Columbia, Maryland to account # xxxxx0575 in the name of Kevin E. Sniffen Esquire at Wachovia Bank, NA of Maryland, which passed through the FEDWIRE system in East Rutherford, New Jersey and then through Wachovia's central processing unit in Winston-Salem, North Carolina before being credited to Sniffen's account |
| 3 | E-mail dated February 11, 2011 from **GRANTHAM** in California to McCloskey and attorney R.B. in Maryland, attaching a letter concerning "Status of IAGU Loans to the McCloskey Group" which falsely represented that the closings on three loans totaling $6.415 million from IAGU to the McCloskey Group were scheduled to occur in late February and in March 2011 |
| 4 | E-mail dated March 10, 2011 from **BELZNER** in Maryland to **PHELAN** and **GRANTHAM** in California providing a script for a letter for them to send to attorney R.B. falsely explaining why none of the three IAGU loans to the McCloskey Group had closed |
| 5 | E-mail dated March 10, 2011 from **GRANTHAM** in California to attorney R.B. in Maryland using the text of **BELZNER's** previous e-mail-purporting to explain why none of the three IAGU loans to the McCloskey Group had yet closed |
| 6 | E-mail dated April 11, 2011 from **GRANTHAM** in California to Mr. R.R., attorney R.B., and McCloskey in Maryland, falsely representing that "we have received our participant's funds" |
| 7 | E-mail dated May 11, 2011 from **BELZNER** in Maryland to **PHELAN** and **GRANTHAM** in California providing a script for a letter for **GRANTHAM** to send to attorney R.B. and McCloskey in Maryland |
| 8 | E-mail dated May 11, 2011 from **GRANTHAM** in California to attorney R.B. and McCloskey in Maryland sending a lightly edited version of the script provided by **BELZNER** earlier that same day |

| 9 | E-mail dated July 6, 2011 from **BELZNER** in Maryland to **PHELAN** in California providing a script for an e-mail to be sent to Mr. R.R., attorney R.B., McCloskey and Sniffen |
|---|---|
| 10 | E-mail dated July 6, 2011 from **PHELAN** in California to Mr. R.R., McCloskey, and Sniffen in Maryland incorporating the text of **BELZNER's** e-mail |

18 U.S.C. § 1343
18 U.S.C. § 2

17

## COUNTS ELEVEN THROUGH FIFTEEN

## (Wire Fraud)

1.      The allegations of paragraphs 1 through 7 and 9 through 26 of Count One are realleged and incorporated here.

## The Escrow Fraud Against Mr. S.G. (November 2009 - August 2011)

2.      Mr. S.G. was a real estate developer and investor who also loaned money to other home builders and developers, including **BELZNER.**

3.      In the latter part of 2009, **BELZNER** and McCloskey approached Mr. S.G. and told him that they were trying to obtain a loan of approximately $28 million to finance their construction costs for the York project.   **BELZNER** and McCloskey told Mr. S.G. that **PHELAN**, a loan broker, was working with them to obtain this financing. **BELZNER** and McCloskey represented to Mr. S.G. that it was necessary for them to deposit $2.25 million in an escrow account as a showing of "liquidity" in order to improve their chances of getting the loan.

4.      **BELZNER** and McCloskey asked Mr. S.G. if he could provide the $2.25 million they needed to deposit into the escrow account.   In return, they promised to pay him a fee of $500,000, which they represented would be deposited into the escrow account on the same day the escrow agreement was executed.   **BELZNER** and McCloskey further assured Mr. S.G. that he would retain ownership of the funds deposited into the escrow account and that an attorney named Kevin Sniffen would serve as the escrow agent and would be responsible for safeguarding his funds.   Mr. S.G. agreed to provide the requested $2.25 million.

18

5. On or about December 11, 2009, Mr. S.G., acting on behalf of his personal investment company, and McCloskey, acting on behalf of 1100 Columbia York LLC, concluded an escrow agreement, which Sniffen signed as a witness.   Among other things, the escrow agreement provided that:

- Mr. S.G. would deposit $2.25 million into an escrow account to assist The McCloskey Group in obtaining the financing it was seeking in connection with the York project.

- Except insofar as the funds would serve to meet the lender's liquidity requirement, Mr. S.G. would remain the sole beneficiary of the escrow account, and neither McCloskey, 1100 Columbia York LLC, or any of their creditors would acquire any right, title or interest in the escrowed funds.

- Mr. S.G.' s funds would remain in the escrow account.   Sniffen would serve as the Escrow Agent and would be responsible for retaining and safeguarding the escrow funds until they were returned to Mr. S.G. pursuant to the terms of the agreement.

- Sniffen would not allow any third party other than the lender or Mr. S.G. to obtain possession of, or an interest in, the escrowed funds, and would not withdraw or disburse the funds (or allow anyone else to do so) except as provided by the agreement.

- Mr. S.G.'s principal of $2.25 million and his fee of $500,000 would be returned to him either when the loan funded or no later than March, 1, 2011.

6. On December 11, 2009, Mr. S.G. caused $2.25 million to be wired into a Kevin Sniffen Wachovia escrow account ending in # 8685.   Mr. S.G. believed that only Sniffen had signature authority on this account; in fact, McCloskey was a signatory as well.   **BELZNER** and McCloskey never deposited the agreed $500,000 fee into the escrow account, but Mr. S.G. remained unaware of this.

7. Between on or about December 14 and December 23, 2009, **BELZNER** caused McCloskey to withdraw $2.249 million in Mr. S.G.'s funds from the # 8685

19

escrow account, without the knowledge of Mr. S.G. or his attorney, and to transfer it to an account (# 3061) in the name of the York project at Wachovia Bank.   Sniffen took no action to stop **BELZNER** and McCloskey, and he did not notify Mr. S.G., his attorney, or the authorities about what had occurred.   **BELZNER** and McCloskey used the stolen funds to make payments to other creditors of **BELZNER's** or of the McCloskey Group's, and to pay for personal expenses.

8.     In the first part of January 2010, Mr. S.G. asked for documentary confirmation showing that his funds and the promised $500,000 fee were still on deposit in account # 8685.   On or about January 12, 2010, McCloskey prepared an altered version of a Wachovia Bank statement which made it appear that the escrow account had a balance of $2,751,000.   In fact, the account balance at this time was less than $1,000.   McCloskey provided the fraudulent bank statement to Sniffen, who used his computer to make the statement look more authentic, and then transmitted it by e-mail to Mr. S.G.

9.     **BELZNER** subsequently asked Mr. S.G. to extend the term of their agreement and leave the funds in the escrow account beyond March 1, 2010, because they were still attempting to obtain financing for the York project.   Mr. S.G. agreed to do this, but he also continued to request and receive copies of account statements from Sniffen that falsely reflected that his original funds were still being held in the account.

10.     In May 2010, **BELZNER** asked Mr. S.G. for an additional cash infusion of $1.3 million into the escrow account.   Mr. S.G. agreed to provide these funds.   In return for this further infusion of funds, **BELZNER** and McCloskey agreed to pay Mr. S.G. an additional fee of $400,000, which likewise was supposed to be deposited into the # 8685

20

escrow account and retained there for Mr. S.G.   This fee, too, was never actually paid by
McCloskey or his company.   Nevertheless, on May 7, 2010, Sniffen confirmed in two
e-mails to Mr. S.G. and his counsel that the $400,000 deposit from McCloskey had been
received, and he provided wiring instructions to Mr. S.G. for sending his additional $1.3
million.   Sniffen sent an e-mail to Mr. S.G. containing another altered Wachovia Bank
statement for account # 8685 which falsely represented the balance in the account as
$3.151 million.

11.     Upon receiving Sniffen's confirmation that the agreed $400,000 fee had
been deposited, on May 11, 2010 Mr. S.G. caused the additional $1.3 million to be wired
into the Kevin Sniffen # 8685 escrow account at Wachovia Bank.   Over the following
two days, McCloskey withdrew a total of $1.298 million from the account, in violation of
the escrow agreement and without the knowledge or permission of Mr. S.G. or his
counsel.   **BELZNER** and McCloskey used the money to pay prior creditors and
business and personal expenses.

12.     On June 18, 2010, Sniffen sent an altered Wachovia Bank statement for
account # 8685 to Mr. S.G. falsely reflecting that the available balance in the account
then stood at $4.451 million.   On August 31, 2010, Sniffen sent another altered
Wachovia Bank statement for account # 8685 to Mr. S.G. which falsely reflected that
McCloskey had deposited an additional $100,000 to into the escrow account to pay for a
further extension of the term of the escrow agreement, thereby making it appear that the
balance in the account was now $4.551 million.

13.     In October 2010, Mr. S.G. demanded that he be allowed to confirm the
existing bank balance in the escrow account directly with an employee of Wachovia

21

Bank.   In response, McCloskey and Sniffen arranged to transfer or deposit into the

escrow account other funds totaling approximately $4.5 million.   Sniffen then arranged

for Mr. S.G. to confirm the existing balance in the account with an employee at

Wachovia's Timonium, Maryland branch.   Once Mr. S.G. received confirmation,

McCloskey caused a majority of the funds in the account to be removed or disbursed.

14.   On or about February 4, 2011, in order to induce Mr. S.G. to wire an

additional $290,000 to the escrow account, Sniffen sent Mr. S.G. an e-mail falsely

confirming that the balance in the account then stood at $4.45 million.   As a result, Mr.

S.G. wired an additional $290,000 to the # 8685 escrow account a few minutes later.

The actual balance was $710.57.

15.   As **BELZNER** and McCloskey continued to postpone the date for

returning the funds supposedly being held for Mr. S.G. in the # 8685 escrow account,

they enlisted the assistance of **PHELAN** and **GRANTHAM** to support their deception

by making it appear that the funding on the York transaction was imminent, whereupon

Mr. S.G.'s escrowed funds and the agreed fee payments would be released to him.   For

example, on March 10, 2011, **PHELAN** and **GRANTHAM** produced a letter on IAGU

letterhead, signed in **GRANTHAM's** name and directed to McCloskey, which falsely

reported that the recordation process for the York project had been delayed, but that the

problem was resolved and the process would be completed by March 11.   IAGU

employee Sean Krondak e-mailed this letter to McCloskey, who then forwarded it to Mr.

S.G., as well as Sniffen, **BELZNER**, and **PHELAN**, with the added sentence, "We are

finally getting to the funds after all this time."

22

16.     On July 29, 2011, **PHELAN** sent an e-mail to **BELZNER** and McCloskey falsely representing that "Funding has been approved and all necessary documentation approved and completed," and that the York loan would close on August 10, 2011. **BELZNER** and McCloskey then provided this e-mail to Mr. S.G. and his counsel in order to lull them into believing that Mr. S.G.'s escrowed funds and fees would soon be released to him.

17.     In July and August 2011, the defendants' fraudulent escrow scheme began to unravel as various escrow account investors and Mr. E.M. discovered that their funds had been stolen.   There was no loan, lender or approved documentation for the York project, as **PHELAN** had claimed.   Mr. S.G. suffered a loss of approximately $3.115 million.

## Executions of the Scheme and Artifice to Defraud

18.     On or about the dates indicated below, in the District of Maryland and elsewhere, the defendants

**PATRICK J. BELZNER,**
**a/k/a "Patrick McCloskey,"**
**MERVYN A. PHELAN, SR.,**
**and**
**GREGORY E. GRANTHAM,**

together with Brian McCloskey, Kevin Sniffen, and others known and unknown to the Grand Jury, for the purpose of executing the scheme and artifice to defraud, and attempting to do so, knowingly and willfully caused to be transmitted in interstate commerce by means of wire communication certain signs and signals, to wit, the transmissions set forth below:

23

| COUNT | DESCRIPTION OF WIRE TRANSMISSION |
|---|---|
| 11 | Wire transfer on December 11, 2009 in the amount of $2.25 million from account # 5655 in the name of Mr. S.G. at Carrollton Bank in Columbia, Maryland to account # 8685 in the name of "Kevin Sniffen Esquire" at Wachovia Bank, NA of Maryland, which passed through the FEDWIRE system in East Rutherford, New Jersey and then through Wachovia's central processing unit in Winston-Salem, North Carolina before being credited to Sniffen's account |
| 12 | Wire transfer on May 11, 2010 in the amount of $1.3 million from account # 1357 in the name of Mr. S.G.'s personal investment company at Carrollton Bank in Columbia, Maryland to account # 8685 in the name of "Kevin E. Sniffen Esquire" at Wachovia Bank, NA of Maryland, which passed through the FEDWIRE system in East Rutherford, New Jersey and then through Wachovia's central processing unit in Winston-Salem, North Carolina before being credited to Sniffen's account |
| 13 | E-mail dated March 1, 2011 from **BELZNER** in Maryland to **PHELAN** in California and McCloskey providing the text for a letter to be sent by **PHELAN** |
| 14 | E-mail dated March 10, 2011 from Krondak in California to McCloskey in Maryland enclosing a letter dated March 9, 2011 over **GRANTHAM's** signature |
| 15 | E-Mail dated July 29, 2011 from **PHELAN** in California to **BELZNER** and McCloskey in Maryland falsely stating that funding had been approved and all necessary documentation completed and approved for the York loan, allowing disbursement to take place on August 10, 2011 |

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNTS SIXTEEN THROUGH TWENTY-TWO

### (Wire Fraud)

1.      The allegations of paragraphs 1 through 7 and 9 through 26 of Count One are realleged and incorporated here.

### The Escrow Fraud Against Mr. G.C. (November 2009 - August 2011)

2.      Mr. G.C. was a business owner and real estate developer and investor who also loaned funds to other real estate developers, including **BELZNER**.

3.      In or about November 2009, **BELZNER** approached Mr. G.C. and told him that three investors (one of whom was Mr. R.R.) had placed funds in an IAGU-controlled escrow account to support a loan that IAGU was trying to arrange on behalf of the McCloskey Group.   **BELZNER** told Mr. G.C. that the loan had not yet funded, but that the three investors wanted their escrow funds returned.   **BELZNER** represented that he needed Mr. G.C. to buy out the three investors by paying them the $350,000 they were then owed, in return for which he would take their place as the owner of the $350,000 held in the escrow account, and would also receive a fee of $100,000.   Mr. G.C. agreed to **BELZNER's** proposal and obtained cashier's checks payable to the other three men.   In fact, there was no escrow account that contained $350,000 received from these three men, so Mr. G.C. did not succeed to their interest in anything.   Rather, **BELZNER** simply used Mr. G.C. to pay off existing debts that he owed to these three creditors.

4.      In or about October 2010, **BELZNER** persuaded Mr. G.C. to make an additional escrow account investment of $600,000, which **BELZNER** represented

would be retained in the same account as the $450,000 that was supposedly being held for him as a result of the November 2009 transaction.

5.      On October 5, 2010, in accordance with this understanding, Mr. G.C. transferred $600,000 by wire into a Bank of America account ending in # 9359, which was titled in the name of RP&B Development Consultants.   In fact, account # 9359 was not an escrow account.   Instead, the sole signatory on this account was Mr. R.M., a friend of **BELZNER's** who had agreed to open bank accounts, including the RP&B account, under other names for **BELZNER's** use.

6.      On the same day that Mr. G.C. wired the $600,000 into the RP&B account, Krondak sent an e-mail to McCloskey on which he copied Mr. G.C. along with **BELZNER** and **PHELAN**.   A letter on the letterhead of WMCI Financial, the company where **PHELAN** had worked prior to IAGU, was attached to this e-mail, which was addressed to McCloskey and signed by **PHELAN**.   This letter stated:

> Thank you for the written authorization today acknowledging your request
> the [sic] change in ownership regarding the escrow funds.   As escrow
> agent you have instructed me that of the $2,850,000 that is in escrow, the
> ownership of $1,050,000 as of today is the property of [Mr. G.C.].   His
> ownership is changed as of this 5th day of October 2010 from $450,000 to
> $1,050,000.

In fact, there was no such escrow account, and the above representations were all false.

7.      **BELZNER** subsequently instructed Mr. R.M. to use $180,000 of the $600,000 that Mr. G.C. placed in the RP&B account to make a payment to one of his creditors.   **BELZNER** and McCloskey used another $200,000 of these funds to help pay for IAGU's planned purchase of Workmen's Life.   The remaining $220,000 of Mr.

G.C.'s funds were used to pay other creditors of **BELZNER's** and McCloskey's; to make an $11,000 mortgage payment for **BELZNER's** new residence; and to obtain cash.

8.      In early October 2010, **BELZNER**, McCloskey, and **PHELAN** participated in a conference call with Mr. G.C. and his counsel in which they falsely represented that a pending $30 million loan for the York property was being held up because **BELZNER** and McCloskey needed additional funds to be placed in an escrow account.   Mr. G.C. agreed to contribute the additional funds.

9.      On or about October 8, 2010, Mr. G.C. and Brian McCloskey signed a Loan and Security Agreement.   This Agreement falsely stated that 1100 Columbia York LLC, a company affiliated with the McCloskey Group, had a commitment for a $30 million HUD loan through Eastern Mortgage Capital.   This Agreement further represented that "[t]he terms of the HUD Loan require that the [McCloskey or his companies] deposit the sum of $4,350,000.00 (the "Escrow Funds") to be held in escrow and released/disbursed at the time of settlement of the HUD Loan."   In fact, Eastern Mortgage Capital had not made a commitment to provide 1100 Columbia York with a $30 million HUD loan, and there was accordingly no requirement in connection with such a loan from any actual lender that $4.35 million be deposited into an escrow account.   This agreement also provided that IAGU would act as the Escrow Agent.

10.      On October 14, 2010, pursuant to his agreement to provide the additional escrow funds, Mr. G.C. wired $1.837 million into a Wachovia Bank account ending in # 2884, which was actually the general operating account of the McCloskey Group.   A friend of Mr. G.C.'s wired another $1 million into that account that same day-to serve as evidence of liquidity in connection with the closing on the $30 million HUD loan.

27

11.    On the same day that Mr. G.C. and his friend wired the $2.837 million into the McCloskey Group account # 2884, $2.78 million of those funds was transferred by wire out of the account and into the Sniffen account # 8685, where they were used to satisfy Mr. S.G. that his invested funds and fees remained in Sniffen's escrow account, as discussed in Counts 11 through 15, paragraph 13 above.   Once these funds were used to satisfy Mr. S.G. that his funds remained in the account, **BELZNER** and McCloskey subsequently used most of these funds to pay existing creditors.

12.    On October 18, 2010, **BELZNER** and McCloskey caused a $30,000 wire transfer to be sent from the Sniffen account # 8685 to a Wells Fargo Bank account in the name of IAGU and ending in # 8342.   This $30,000 was immediately parceled out to multiple IAGU-affiliated accounts and was then spent for various purposes.

13.    On November 8, 2010, **PHELAN** e-mailed a letter, which was drafted on WMCI Financial letterhead and addressed to McCloskey, to **BELZNER** and McCloskey. This letter falsely stated that "the escrow account is holding $4,350,000. We now have all necessary escrow funds in possession in order for the transaction to be facilitated." This representation was false.   Aside from the $30,000 discussed in the previous paragraph, none of the funds made available by Mr. G.C. and his friend had made their way to any IAGU-related account, and neither WMCI nor IAGU was maintaining any escrow account in connection with this transaction.

14.    At the beginning of 2011, Mr. G.C. and his attorney, Mr. J.O., began demanding the return of the more than $4 million Mr. G.C. and his friend had provided that was supposedly being held in an escrow account controlled by **PHELAN**.   During the spring and summer of 2011, **PHELAN** and **GRANTHAM** sent multiple

communications to Mr. G.C. and his counsel in an effort to lull them into believing that the funding of the York project loan was imminent and that the release of the escrowed funds would follow shortly thereafter.   Although **PHELAN** and **GRANTHAM** in their communications with Mr. G.C. and his counsel made it sound as if **BELZNER** and McCloskey were independent businessmen with whom they were dealing on an arm's length basis, in reality the four conspirators were in constant communication with each other and carefully coordinated their responses to Mr. G.C.'s and his counsel's inquiries and demands for the return of his funds.

15.     In all, Mr. G.C., his friend, and his counsel J.O. contributed a total of approximately $4.05 million to help meet what **BELZNER, PHELAN,** and McCloskey represented were IAGU's requirements for closing the $28 million loan for the York project.   Mr. G.C. received in return payments from **BELZNER** and McCloskey totaling about $210,000, thereby resulting in a net loss for Mr. G.C., his friend, and his counsel J.O. of approximately $3.8 million.

### Executions of the Scheme and Artifice to Defraud

16.     On or about the dates indicated below, in the District of Maryland and elsewhere, the defendants

**PATRICK J. BELZNER,**
**a/k/a "Patrick McCloskey,"**
**MERVYN A. PHELAN, SR.,**
**and**
**GREGORY E. GRANTHAM,**

together with Brian McCloskey, Kevin Sniffen, and others known and unknown to the Grand Jury, for the purpose of executing the scheme and artifice to defraud, and

29

attempting to do so, knowingly and willfully caused to be transmitted in interstate

commerce by means of wire communication certain signs and signals, to wit, the

transmissions set forth below:

| COUNT | DESCRIPTION OF WIRE TRANSMISSION |
|---|---|
| 16 | E-Mail dated October 5, 2010 from Krondak in California to McCloskey in Maryland on which Mr. G.C., **BELZNER**, and **PHELAN** were copied, and attaching a letter on WMCI Financial letterhead that was signed by **PHELAN** |
| 17 | Wire transfer on October 18, 2010 in the amount of $30,000 from account # xxxxx8685 in the name of "Kevin E. Sniffen Esquire" at Wachovia Bank, NA of Maryland to account # xxxxx8342 in the name of IAGU Underwriters, LLC at Wells Fargo Bank in California |
| 18 | E-Mail dated November 8, 2010 from **PHELAN** in California to McCloskey in Maryland on which Mr. G.C. was copied and attaching a letter from **PHELAN** on WMCI letterhead falsely representing that the escrow account holding the funds received from Mr. G.C. and his friend had a balance of $4.350 million |
| 19 | E-mail dated March 4, 2011 from **BELZNER** in Maryland to **PHELAN** in California (with a copy to McCloskey) providing a text for an email to be sent by **PHELAN** to Mr. G.C. and his counsel J.O. |
| 20 | E-mail dated March 4, 2011 from **PHELAN** in California to Mr. G.C. and his counsel J.O. in Maryland (with a copy to McCloskey) using the text received from **BELZNER** earlier that same day |
| 21 | E-mail dated March 10, 2011 from **BELZNER** in Maryland to **PHELAN** in California providing a text for an e-mail to be sent by **PHELAN** to McCloskey, with copies to Mr. G.C. and attorney J.O. |
| 22 | E-mail dated March 10, 2011 from **PHELAN** in California to McCloskey in Maryland, which was copied to Mr. G.C., using the text received from **BELZNER** |

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNTS TWENTY-THREE THROUGH TWENTY-EIGHT

## (Wire Fraud)

1.      The allegations of paragraphs 1 through 7 and 9 through 26 of Count One are realleged and incorporated here.

### The Escrow Fraud Against Mr. B.L. and Related Entities
### (Summer 2010 - August 2011)

2.      Mr. B.L. was a banker, investment manager, and private money lender who was located in Reisterstown, Maryland. Mr. B.L. had loaned money to the McCloskey Group in 2009 and 2010.

### A.      The Namkeb, LLC Escrow Account Fraud

3.      In the summer of 2010, **BELZNER** and McCloskey approached Mr. B.L. and solicited him to invest in an escrow account transaction.    **BELZNER** introduced himself to Mr. B.L. as "Patrick McCloskey," falsely representing that he was Brian McCloskey's brother.

4.      **BELZNER** and McCloskey told Mr. B.L. that they were trying to develop three separate real estate projects -- 1100 Columbia York, Brigadoon Harbor and Estates of McCormick.    They represented to Mr. B.L. that they needed to show a certain amount of "liquidity" in order to obtain loans from Workmen's Life to finance the three projects, and that IAGU was a related brokerage company that was underwriting the loans for the three projects.    They explained that if Mr. B.L. agreed to place $3.3 million into an escrow account to provide the necessary showing of liquidity, the funds would be returned to him within four to six months along with a $1 million fee.

31

5.      Mr. B.L. contacted **PHELAN** in California to assess the proposal.   During this call, **PHELAN** assured Mr. B.L. that it was acceptable to IAGU if the funds in escrow did not actually belong to **BELZNER** and McCloskey, but instead consisted of funds that actually belonged to Mr. B.L.

6.      In the course of the negotiations relating to the proposed escrow account transaction, **BELZNER** and McCloskey told Mr. B.L. that attorney Kevin Sniffen would serve as the escrow agent.   Mr. B.L. preferred to use an escrow agent whom he knew personally, but when he contacted **GRANTHAM** and raised this issue, **GRANTHAM** refused to authorize the use of anyone other than Sniffen to be the escrow agent. **GRANTHAM** falsely represented that Sniffen had undergone a four-month certification process before being approved to serve in that capacity.

7.      On or about September 13, 2010, **GRANTHAM** provided false written confirmation to Mr. B.L.'s counsel that:   (1) the deposit of the funds into one or more escrow accounts was a requirement for the loan transactions to proceed; (2) all funds deposited into the escrow accounts to satisfy the liquidity requirement would at all times remain the property of the escrow account investors and would not be subject to claims or attachment by any other persons or entities; and (3) any funds placed in the escrow accounts would be distributed to the escrow account investors on the earlier of (i) the closing of the loan or (ii) the passage of 120 days.

8.      Upon receiving this confirmation from **GRANTHAM**, Mr. B.L. decided to proceed with the transaction.   On or about September 14, 2010, he formed a limited liability company, Namkeb LLC, along with three other individuals, to serve as a vehicle

for the escrow account investment.   Each of Namkeb's four members contributed funds that together totaled $3.3 million.

9.      On or about September 14, 2010, Namkeb, the McCloskey Group, McCloskey and Sniffen entered into an agreement which provided that in return Namkeb's depositing the agreed $3.3 million into the Sniffen escrow account, Namkeb would receive all of the escrow funds back, as well as an additional $1 million fee, on or before the earlier of the date of the closing of the Workmen's Life loan or January 15, 2011.

10.      On or about September 15, 2010, Mr. B.L. caused $3.3 million to be wired to account # 8685 in the name of "Kevin E. Sniffen, Esquire" at Wachovia Bank.

11.      Between on or about September 15, 2010 and September 22, 2010, **BELZNER** and McCloskey withdrew and stole almost the entire $3.3 million from the account ending in # 8685, without the knowledge of Mr. B.L. or any of the other investors who were members of Namkeb.

### B.      The Repid, LLC Escrow Account Fraud

12.      In or about December, 2010, **BELZNER** and McCloskey approached Mr. B.L. and told him that Workmen's Life had agreed to loan a McCloskey Group entity called Lane Nine Properties, LLC money for a different project located on Turkey Point Road.   As with the Namkeb transaction, **BELZNER** and McCloskey represented to Mr. B.L. that if he deposited money into an escrow account, they could satisfy the "liquidity" requirements imposed by Workmen's Life that were a pre-condition for receiving the loan.   **BELZNER** and McCloskey made the same false representations they had in

33

connection with the Namkeb transaction. Mr. B.L. agreed to deposit the money using a limited liability company established for investment purposes called Repid, LLC.

13. On or about December 22, 2010, Mr. B.L., acting on behalf of Repid, entered into an escrow agreement which provided that in return for the deposit of Repid's $1.55 million into the Sniffen escrow account, Repid would receive a fee of $370,000 and a guarantee that both the fee and the escrowed funds would be returned on the earlier of either the closing date on the Workmen's Life loan or January 17, 2011. The agreement provided the same guarantees as the Namkeb agreement regarding the security and ownership of the escrow funds.

14. On December 22, 2010, Mr. B.L. caused $1.55 million to be wired from a bank account in the name of Repid, LLC to account # xxxxx4719 titled as "Kevin E. Sniffen Esquire FBO Repid" at Wachovia Bank.   Sniffen then transferred virtually all of that $1.55 million into the Sniffen escrow account # 8685.

15. Between December 23, 2010 and January 3, 2011, **BELZNER** and McCloskey withdrew and stole almost all of the Repid funds that had been transferred from account # 4719 to # 8685, without the knowledge of Mr. B.L.   **BELZNER** and McCloskey used the Repid funds to pay other creditors of theirs and also transferred $200,000 into a McCloskey Group account that was used to pay for various personal and business expenses.

16. In or about early January 2011, **BELZNER** and McCloskey convinced Mr. B.L. to enter into two more escrow agreements in the name of Repid, LLC, telling him that they needed the funds to show liquidity in connection with loan applications pending with IAGU for two more projects, which were known as Necker Avenue and 75th

34

Street.   As with the previous agreements, **BELZNER** and McCloskey represented to Mr. B.L. that the monies placed in escrow would remain the property of Repid, would not be removed, and would be returned to Repid within a short period of time with a substantial fee.

17.    On or about January 5, 2011, **GRANTHAM** issued two letters on IAGU letterhead, directed to Mr. B.L. and McCloskey.   In both letters, **GRANTHAM** falsely stated that the "Lender's" underwriting procedures required that the funds be deposited into an escrow account with Sniffen and gave assurances that the ownership of the escrowed monies would remain with Repid at all times.

18.    On January 5, 2011, Mr. B.L., on behalf of Repid, entered into two escrow agreements relating to the Necker Avenue and 75th Street projects involving $1.3 million and $885,000 respectively.   The agreements provided the same basic terms and conditions as the previous escrow agreements with Repid and with Namkeb regarding the security and ownership of the escrow funds, and both agreements provided that the escrow monies would be returned, at the latest, on or before January 17, 2011.

19.    Relying upon those agreements and the false and fraudulent representations made by **BELZNER** and McCloskey concerning the security and ownership of the escrow funds, Mr. B.L. caused an additional $ 1.185 million to be wired into the Sniffen account # 4719.   In five transactions carried out between January 5 and January 10, Sniffen transferred all but $1,000 of that $1.185 million into the Sniffen escrow account # 8685, and in violation of the terms of the escrow agreement and without the knowledge or permission of Mr. B.L.

35

20.    Between January 6 and January 10, 2011, **BELZNER** and McCloskey withdrew and stole almost all of Repid's funds from account # 8685, without the knowledge of Mr. B.L.    **BELZNER** and McCloskey again used the stolen funds to pay other creditors of theirs and to pay for other personal and business expenses, including an $11,000 mortgage payment on **BELZNER's** new house.

21.    As of January 17, 2011, none of the Namkeb or Repid funds had been returned, as required under the escrow agreements, and in fact, **BELZNER** and McCloskey had already spent most of those funds.    Over the next several months, Mr. B.L. repeatedly demanded explanations for the delay, proof that the escrow funds were still in place, and ultimately, the return of all of the Namkeb and Repid funds.    In order to conceal the fact that the Namkeb and Repid escrow monies had been removed from the escrow accounts and dissipated, and to persuade Mr. B.L. to continue to wait for the return of the escrow funds, **BELZNER, PHELAN, GRANTHAM** and their conspirators responded to Mr. B.L.'s demands by making numerous false statements, sending him falsified documents and engaging in other deceptive practices, including but not limited to temporarily inflating the balance of the Sniffen escrow account, making partial "lulling" payments to Mr. B.L., and lying about the status of the funding for the projects and the identity of "participants" in the transactions.

22.    The defendants and their conspirators continued to deceive Mr. B.L. with false representations and promises until on or about August 10-12, 2011, when the scheme was exposed and Mr. B.L. learned for the first time that the Namkeb and Repid escrow monies had long since been stolen.    The Namkeb and Repid investors incurred a loss of approximately $4 million on these escrow account transactions.

**Executions of the Scheme and Artifice to Defraud**

23.    On or about the dates indicated below, in the District of Maryland and

elsewhere, the defendants

**PATRICK J. BELZNER,**
**a/k/a "Patrick McCloskey,"**
**MERVYN A. PHELAN, SR.,**
**and**
**GREGORY E. GRANTHAM,**

together with Brian McCloskey, Kevin Sniffen, and others known and unknown to the

Grand Jury, for the purpose of executing the scheme and artifice to defraud, and

attempting to do so, knowingly and willfully caused to be transmitted in interstate

commerce by means of wire communication certain signs and signals, to wit: the e-mail

communications set forth below:

| COUNT | DESCRIPTION OF WIRE TRANSMISSION |
|---|---|
| 23 | E-Mail dated March 10, 2011 from **BELZNER** in Maryland to **PHELAN** in California providing a script for an e-mail to be sent by **PHELAN** to Mr. B.L. |
| 24 | E-Mail dated March 10, 2011 from **PHELAN** in California to Mr. B.L. in Maryland, with a copy to **GRANTHAM** and McCloskey, using the text received from **BELZNER** earlier that same day |
| 25 | E-Mail dated March 31, 2011 from Krondak in California to **BELZNER** and McCloskey in Maryland, with a copy to S.K., **PHELAN** and **GRANTHAM**, attaching a bogus Participation Agreement |
| 26 | E-Mail dated April 6, 2011 from **BELZNER** in Maryland to **PHELAN** in California, with a copy to **GRANTHAM**, providing a script for an e-mail to be sent by **PHELAN** to Mr. B.L. |
| 27 | E-Mail dated April 6, 2011 from **PHELAN** in California to Mr. B.L. in Maryland, with a copy to McCloskey, using the text received from **BELZNER** earlier that same day |

| 28 | E-Mail dated May 7, 2011 from **GRANTHAM** in California to **PHELAN**, with a copy to **BELZNER** and McCloskey in Maryland, containing a proposed explanation for the continuing delay in providing funds |

18 U.S.C. §1343
18 U.S.C. § 2

## COUNTS TWENTY-NINE THROUGH THIRTY-FIVE

### (Wire Fraud)

1.      The allegations of paragraphs 1 through 7 and 9 through 26 of Count One are realleged and incorporated here.

### The Escrow Fraud Against Mr. E.M. (November 2011 - May 2011)

2.      Mr. E.M. was a real estate developer specializing in hotel properties.   In the fall of 2010, Mr. E.M. was seeking in excess of $30 million in financing for the purpose of constructing hotels on a site in Bowie, Prince George's County, Maryland.

3.      In late September 2010, Mr. E.M was placed in contact with **PHELAN** and **GRANTHAM**, whom he had been advised might be able to locate the financing he needed.   In their subsequent dealings with Mr. E.M., **PHELAN** and **GRANTHAM** represented that TAG and Workmen's Life would be the actual lenders.

4.      In late October 2010, **PHELAN** and **GRANTHAM** traveled to Maryland to meet with Mr. E.M. and members of his development team at the planned site of the hotels in Prince George's County.   **BELZNER** and McCloskey accompanied **PHELAN** and **GRANTHAM** to the meeting to serve as references for the ability of TAG and its related entities, including Workmen's Life, to get financing deals done.   **BELZNER** played an active part in Mr. E.M.'s subsequent discussions with **PHELAN** and **GRANTHAM.**   Throughout their discussions, Mr. E.M. understood that **BELZNER's** name was "Patrick McCloskey."

5.      **PHELAN** and **GRANTHAM** advised Mr. E.M. that it would be necessary for his company to satisfy a "liquidity requirement" on each loan by placing substantial

39

sums in what they described as a bonded escrow account under the control of Kevin Sniffen, an attorney who had been previously approved by them.   Initially, **GRANTHAM** informed Mr. E.M. that he would be required to place a total of $4.3 million in this escrow account.   When Mr. E.M. balked at this requirement, **PHELAN** reached out to **BELZNER** and McCloskey for their assistance.   Ultimately Mr. E.M. agreed to place approximately $1,100,000 in the escrow account, on the understanding that McCloskey would contribute an additional $247,526.   It was further agreed that these amounts would be refunded at the time of the closing on the construction loans-for the first two hotels, which was scheduled to occur on March 25, 2011.

6.      On or about January 21, 2011, Mr. E.M. executed an escrow agreement with Sniffen which provided that the Escrow Agent was holding the funds for the benefit of Mr. E.M.'s company, and that the funds would be returned to his company either on the closing date of the loan or, in any event, no later than March 31, 2011.   Mr. E.M. arranged for two wire transfers totaling $1,050,000 to be sent to Sniffen's Wachovia Bank escrow account # 8685.   On January 31, 2011, Mr. E.M. caused an additional $100,000 to be wired to Sniffen's # 8685 escrow account.

7.      Between January 21, 2011 and February 14, 2011, without Mr. E.M.'s knowledge or authorization, McCloskey removed almost all of the funds deposited in the escrow account by Mr. E.M.   He wired $20,000 to IAGU; the remainder was used to pay creditors and other expenses of **BELZNER** and McCloskey and transferred to other McCloskey-related entities.

8.      Following Mr. E.M.'s original deposit of funds into Sniffen's # 8685 escrow account on January 21st, Mr. E.M. and **GRANTHAM** continued to have discussions

40

with regard to Workmen's Life financing the construction of a third hotel that Mr. E.M. intended to construct on the same parcel of land in Bowie.   **GRANTHAM** issued a commitment letter for this loan on TAG/Workmen's Life letterhead and transmitted this by e-mail to Mr. E.M. on or about February 9, 2011.   The terms of the commitment letter required Mr. E.M. to place $1.3 million in a bonded escrow account with Kevin Sniffen by the following day, which would be released at closing on the loan, or by no later than February 25th.   That did not occur, although Mr. E.M. did wire an additional $100,000 to Sniffen that day, which **BELZNER** and McCloskey immediately used to make an $80,000 lulling payment to Mr. B.L.

9.   On the morning of February 15, 2011, **BELZNER** appeared at Mr. E.M.'s office without an appointment or advance notice and told him that he must immediately make an additional substantial deposit into Kevin Sniffen's escrow account in order to meet the liquidity requirements for the third hotel transaction.   **BELZNER** claimed that these additional funds would improve Mr. E.M.'s chances of obtaining the financing for the third property quickly.   **BELZNER** told Mr. E.M. that he should refinance the parcel of land his company owned in Bowie where the hotels were to be built by borrowing approximately $2.1 million from a trust, which in turn would be given a lien against the Bowie property.   **BELZNER** brought a settlement attorney with him to Mr. E.M.'s office to carry out the transaction.

10.   Mr. E.M. asked for time to have his attorneys review the papers, but **BELZNER** refused and insisted that the transactions must proceed that morning. Eventually, Mr. E.M. agreed to execute the papers and proceed with the settlement. That same day, a wire for $2,010,780 consisting of funds borrowed from the trust was

41

transmitted from the settlement company that carried out the transaction to Sniffen's # 8685 escrow account, which at that time had a balance of less than $300.   Between February 15th and February 17th, **BELZNER** and McCloskey used virtually all of those Mr. E.M. funds to make payments to various creditors.

11.     On February 17, 2011, Sniffen transmitted by e-mail an executed amendment to the original escrow agreement with Mr. E.M. which represented that the balance of funds in the escrow account then totaled $4.162 million.   In fact, the balance in the account as of the close of business on that date was $70.17.

12.     None of the financing that Mr. E.M. had sought from **PHELAN** and **GRANTHAM** in connection with the construction of the three hotels materialized by the dates originally promised.   When Mr. E.M. began demanding that his funds be returned to him as provided by the escrow agreements, Sniffen e-mailed an altered and fraudulent Wachovia Bank statement for account # 8685 to Mr. E.M. which indicated that the account had a balance as of May 3, 2011 of $4,281,600.   The actual account balance on that date was $556.87.

13.     Mr. E.M. never received financing from TAG or Workmen's Life for the construction of any his three hotel projects, and never received back any of the principal or borrowed funds totaling $3,275,780 that he deposited into Sniffen's # 8685 escrow account.

## Executions of the Scheme and Artifice to Defraud

14.    On or about the dates indicated below, in the District of Maryland and

elsewhere, the defendants

**PATRICK J. BELZNER,**
**a/k/a "Patrick McCloskey,"**
**MERVYN A. PHELAN, SR.,**
**and**
**GREGORY E. GRANTHAM,**

together with Brian McCloskey, Kevin Sniffen, and others known and unknown to the

Grand Jury, for the purpose of executing the scheme and artifice to defraud, and

attempting to do so, knowingly and willfully caused to be transmitted in interstate

commerce by means of wire communication certain signs and signals, to wit, the wire

communications set forth below:

| COUNT | DESCRIPTION OF WIRE TRANSMISSION |
|---|---|
| 29 | E-mail dated January 20, 2011 from Sniffen in Maryland to Mr. E.M. and **PHELAN** in California enclosing the escrow agreement for the Bowie hotel loan transactions and the wiring information for his Wachovia Bank escrow account # 8685 |
| 30 | Wire transfer on January 21, 2011 in the amount of $600,000 from account # xxxxx6101 at Columbia Bank in Maryland to account # xxxxx8685 in the name of "Kevin E. Sniffen Esquire" at Wachovia Bank, NA of Maryland, which passed through the FEDWIRE system in East Rutherford, New Jersey and then through Wachovia's central processing unit in Winston-Salem, North Carolina before being credited to Sniffen's account |
| 31 | Wire transfer on January 21, 2011 in the amount of $450,000 from account # xxxxx5701 at Columbia Bank in Maryland to account # xxxxx8685 in the name of "Kevin E. Sniffen Esquire" at Wachovia Bank, NA of Maryland, which passed through the FEDWIRE system in East Rutherford, New Jersey and then through Wachovia's central processing unit in Winston-Salem, North Carolina before being credited to Sniffen's account |

| 32 | E-mail dated February 22, 2011 from **BELZNER** in Maryland to **PHELAN** in California with a copy to McCloskey providing a script for an email to be sent by **PHELAN** to Mr. E.M. in order to "get [him] off the plate and push him for a few weeks" by justifying the postponement of the financing date for one of the TAG/Workmen's Life loans |
| --- | --- |
| 33 | E-mail dated February 23, 2011 from **PHELAN** in California to Mr. E.M.'s company e-mail account in Maryland using the text sent the day previously by **BELZNER** |
| 34 | E-mail dated March 22, 2011 from **BELZNER** in Maryland to **PHELAN** and **GRANTHAM** in California, on which McCloskey and Sniffen were also copied, explaining the need to get an extension agreement to Mr. E.M. so that he did not persist in his demand for the return of his funds |
| 35 | E-mail dated March 22, 2011 from **GRANTHAM** in California to Mr. E.M. in Maryland attaching three extension letters extending the due dates for the closings on each of the three hotel loans to April 15, 2011 |

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNTS THIRTY-SIX THROUGH THIRTY-EIGHT ·

### (Wire Fraud)

1.      The allegations of paragraphs 1 through 7 and 9 through 26 of Count One are realleged and incorporated here.

### The Escrow Fraud Against Mr. G.T. and Tyler Mechanical Contracting, Inc. (April 2011 - August 2011)

2.      In the first part of 2011, Mr. G.T. was the President of Tyler Mechanical Contracting, Inc. (Tyler Mechanical), a family-owned firm whose offices were located in Ijamsville, Maryland.   Tyler Mechanical provided design and construction services relating to the installation of heating, air conditioning, and plumbing equipment in commercial, industrial, residential, and public buildings.

3.      In the latter part of February 2011, **BELZNER**, contacted Mr. C.T., who was G.T.'s brother.   **BELZNER,** who throughout this transaction represented himself to be "Patrick McCloskey," advised Mr. C.T. that he was looking for lenders who would be willing to place funds in an escrow account on a short-term basis in order to meet the "liquidity" requirement imposed by the lender in connection with one or more large construction loans it was supposedly prepared to fund on behalf of the McCloskey Group.   Mr. C.T. in turn introduced **BELZNER** to his brother, Mr. G.T., to whom he had spoken to about **BELZNER's** proposal.

4.      **BELZNER** subsequently spoke to Mr. G.T.; to Mr. D.H., the Chief Financial Officer of Tyler Mechanical; and to the company's outside legal counsel on several occasions during the spring of 2011 concerning the escrow account transaction. **BELZNER** promised them that if they loaned funds to the McCloskey Group for

45

placement in the escrow account, they would retain title to the loaned funds; the funds would not be removed from the escrow account; an attorney named Kevin Sniffen would have full control of the escrow account and would be responsible for maintaining the security of the funds; that a fidelity bond in the form of an insurance policy would be obtained to further guarantee the security of the funds; and that the funds would be returned either upon the funding of the loan or the expiration of a specified term. **BELZNER** further falsely represented that others had engaged in similar escrow lending transactions and had been repaid without incident.   **BELZNER** stressed that time was of the essence and that the funds had to be transmitted promptly or the opportunity would be lost.

5.     On or about April 19, 2011, acting on behalf of Tyler Mechanical, Mr. D.H. agreed to place $320,000 in company funds in an escrow account under the control of Kevin Sniffen.   It was agreed between Tyler Mechanical, **BELZNER** and McCloskey that these funds would be maintained in a separate escrow account under Sniffen's control; that the McCloskey Group would place $80,000 of its own funds into this escrow account in order to guarantee the payment of the agreed fee for the use of Tyler Mechanical's funds; and that the escrowed funds, together with the $80,000 fee, would be paid to Tyler Mechanical on the earlier of the date on which the loan was funded or 90 days after Tyler Mechanical's funds were delivered to the escrow agent.

6.     On or about April 20, 2011, Mr. D.H. caused $320,000 to be wired from an account of Tyler Mechanical (# 5906) located at PNC Bank in Philadelphia, Pennsylvania to account # 8685 at Wachovia Bank.   At that date, account # 8685 actually had a negative balance of over $78,000.

7.     **BELZNER** and McCloskey did not transfer $80,000 in McCloskey Group funds into Kevin Sniffen's # 8685 account, and Sniffen did not establish a separate escrow account in the name of Tyler Mechanical.   On the very day the funds were received, **BELZNER** and McCloskey removed almost all of Tyler Mechanical's money. By the end of the next day, the account balance stood at $56.87.

8.     On or about April 22, 2011, Mr. G.T. agreed to place $60,000 of his own funds into an escrow account in order to facilitate the receipt of a construction loan from IAGU or Workmen's Life for the McCloskey Group.   In return for the use of these funds, Mr. G.T. was promised a fee of 25% of the amount of the funds, which would be payable upon the earlier of the date the expected loan to the McCloskey Group funded or upon the passage of 90 days after the funds were received.

9.     On or about April 22, 2011, Mr. G.T. caused $60,000 to be transmitted from an account (# 0191) at BB&T Bank to Kevin Sniffen's account # 8685 at Wachovia Bank, NA of Maryland.   At that time, account # 8685 had a balance of $56.87.

10.     On the very day these funds were received from Mr. G.T., **BELZNER** and McCloskey drained the account, leaving a balance of $556.87.

11.     No loans were ever issued by IAGU or WLIC to the McCloskey Group. When the 90-day terms expired without the loans being received, Mr. G.T. and Mr. D.H. on behalf of Tyler Mechanical began pressing for the return of the funds they had transmitted to Sniffen's Wachovia Bank account.   In response to their demands, **BELZNER** made and caused Sniffen to make various excuses for the failure to return their funds, typically insisting that the loan was expecting to fund within a few more days.

47

12.     On August 10, 2011, Mr. G.T. notified **BELZNER** and McCloskey that unless immediate payment was forthcoming of the funds he and Tyler Mechanical had placed with Sniffen, he would report the matter to the Baltimore Division of the Federal Bureau of Investigation (FBI).   **BELZNER** then promised to repay the funds within two days.   On or about August 12th, **BELZNER** met Mr. G.T. and his company's attorney and gave them two checks drawn on a McCloskey Group account at Wachovia Bank in the amounts of $400,000 and $99,000, which were purportedly to satisfy the principal and fees owed to Mr. G.T. and Tyler Mechanical for the funds they had placed into Sniffen's # 8685 account.   Mr. G.T. subsequently determined that there were insufficient funds in this account to cover either check.   Both Mr. G.T. and Tyler Mechanical lost the full $380,000 that they agreed to place in escrow based upon **BELZNER's** representations.

### Executions of the Scheme and Artifice to Defraud

13.     On or about the dates indicated below, in the District of Maryland and elsewhere, the defendant

**PATRICK A. BELZNER,**
**a/k/a "Patrick McCloskey,"**

together with Brian McCloskey, Kevin Sniffen, and others known and unknown to the Grand Jury, for the purpose of executing the scheme and artifice to defraud, and attempting to do so, knowingly and willfully caused to be transmitted in interstate commerce by means of wire communication certain signs and signals, to wit, the wire transfers of funds set forth below:

48

| COUNT | DESCRIPTION OF WIRE TRANSMISSION |
|-------|----------------------------------|
| 36 | Wire transfer on or about April 20, 2011 in the amount of $320,000 from account # 5906 in the name of Tyler Mechanical Contracting at PNC Bank, Philadelphia, PA to account # 8685 in the name of Kevin Sniffen at Wachovia Bank, NA of Maryland |
| 37 | Wire transfer on or about April 20, 2011 in the amount of $92,000 from account # 8685 in the name of Kevin E. Sniffen, Esquire at Wachovia Bank, NA of Maryland to account # 2905 in the name of IAG Underwriters, LLC Wells Fargo Bank in San Francisco, California |
| 38 | Wire transfer on or about April 22, 2011 in the amount of $60,000 from account # 0191 in the name of Mr. G.T.'s spouse at BB&T Bank, Lumberton, North Carolina to account # 8685 in the name of Kevin Sniffen at Wachovia Bank, NA of Maryland |

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNTS THIRTY-NINE THROUGH FORTY-THREE

### (Wire Fraud)

1.      The allegations of paragraphs 1 through 7 and 9 through 26 of Count One are realleged and incorporated here.

### The Escrow Fraud Against Mr. T.S. and Murcielago, LLC (May 2011 - August 2011)

2.      At all times material herein, Mr. T.S. was an attorney and private investor. Murcielago, LLC was a Virginia company that Mr. T.S. owned and used to make personal investments.

3.      In May 2011, **BELZNER** contacted Mr. C.B., a mortgage broker, and advised him that the McCloskey Group needed to borrow $1.2 million for a term of no more than six months.   **BELZNER** represented that these funds would be placed in an escrow account in order to satisfy the cash requirement for a $23 million construction and development loan from IAGU to the McCloskey Group, which planned to use the funds to build an apartment complex on a parcel of land it was having discussions about purchasing in Allentown, Pennsylvania.   Mr. C.B. contacted Mr. T.S. about this investment opportunity, and Mr. T.S. had Ms. K.A., Murcielago's in-house legal counsel, and Mr. S.N., his outside legal counsel, investigate the transaction.

4.      Between May 17, 2011 and June 10, 2011, negotiations concerning the proposed transaction took place between **BELZNER** on behalf of the McCloskey Group and Ms. K.A., and Mr. S.N. on behalf of Murcielago.   As part of these discussions, **BELZNER** provided Mr. S.N. with a letter from **GRANTHAM** that had been used in the Repid transaction the previous November setting forth TAG's requirement that funds

be placed in escrow and confirming that it was acceptable to TAG for the lender to retain title to the escrow funds.

5.    During the negotiations over the terms of the escrow agreement, Mr. S.N. asked that Murcielago's tax identification number be placed on the escrow account and that Murcielago's name and address placed on the account's bank statements so that it would promptly receive all bank statements and related documents.    Sniffen advised Mr. S.N. that IAGU had rejected these requests.

6.    Mr. S.N. also proposed that he serve as the escrow agent for the account containing Murcielago's funds, rather than having Kevin Sniffen do so.    In response, **GRANTHAM** sent an e-mail to Mr. S.N. on June 7, 2011, on which Sniffen, McCloskey, and **PHELAN** were also copied.    In this e-mail and in a subsequent telephone call with Mr. S.N. and **PHELAN**, **GRANTHAM** falsely represented that Sniffen had to serve as the escrow agent because he was the "designated closing agent approved by our investment committee."    In fact, IAGU did not have an investment committee; key decisions were simply made by **PHELAN** with input from **GRANTHAM**.

7.    On or about June 10, 2011, an escrow agreement was finalized and executed between McCloskey and Mr. T.S. on behalf of Murcielago.    The escrow agreement provided that Murcielago would place the requested $1.2 million into an escrow account controlled by Kevin Sniffen in order to assist the McCloskey Group in meeting the liquidity requirements imposed by IAGU and TAG.

8.    In return for placing these funds in escrow, the McCloskey Group agreed to pay interest at an annual rate of 15%, along with a loan origination fee equal to 5% of the

principal balance, and to grant Murcielago a first priority security interest in the

Allentown property.   The escrow agreement further provided that:

- the McCloskey Group would deposit $300,000 of its own funds into the escrow account;

- the funds deposited into the escrow account would at all times remain the sole and exclusive property of Murcielago;

- Sniffen, in his capacity as the escrow agent, would hold and maintain the escrowed funds for the exclusive benefit of Murcielago until they were returned upon the expiration of the agreement; and

- neither McCloskey personally nor the McCloskey Group would be permitted to use, commingle, transfer, draw upon, or otherwise make use of the escrowed funds for any reason whatsoever.

Finally, the escrow agreement provided that the unpaid principal balance in the amount

of $1.2 million, along with the agreed interest and fees, would be distributed to

Murcielago upon the earlier of the funding date of the TAG/IAGU loan; the date of any

default under the loan and escrow agreements; or December 10, 2011.

9.     On June 13, 2011, pursuant to the terms of the escrow agreement, Mr. T.S.

caused $1.2 million to be wired from an account at Merrill Lynch (account # xxx-x7008)

to an account (# xxxxxxxxx0766 ) in the name of "Kevin E. Sniffen Esquire FBO

Murcielago" at Wachovia Bank, NA of Maryland.

10.     Between June 14 and June 16, 2011, **BELZNER** and his co-conspirators

caused $1,199,900 to be transferred from the Murcielago escrow account ending in #

0766 to Kevin Sniffen's Wachovia Bank account ending in # 8685 (and which, prior to

these transfers, had a balance of $154.96).   Between June 14 and June 17, **BELZNER,**

McCloskey and Sniffen removed virtually all of the Murcielago funds from account #

8685. A total of $480,000 was transferred to another McCloskey Group account at Wachovia Bank ending in # 2884, while most of the remainder was consumed in payments to various creditors of the McCloskey Group. By the close of business on June 17, the balance in the # 8685 account had been reduced to $979.96.

11.     **BELZNER** and McCloskey never deposited $300,000 in McCloskey Group funds into the escrow account, nor did they ever record a first mortgage lien in favor of Murcielago against the Allentown property.

12.     **BELZNER** and Sniffen subsequently provided false and misleading responses to communications from Murcielago's in-house and outside counsel seeking confirmation that the deed reflecting the ownership of the property in the name of the McCloskey Group LLC, two releases relating to prior mortgages on the property, and the Mortgage and Security Interest in favor of Murcielago had been officially recorded in the land records office in Pennsylvania.

13.     On or about July 19, 2011, Sniffen and **BELZNER** sent a fax from the McCloskey Group's office in Maryland to Ms. K.A. in Massachusetts containing a fraudulently altered Wachovia Bank statement which falsely reflected that as of July 18, there was still $1,500,000 in the FBO Murcielago escrow account # 0766.

14.     In early August 2011, Murcielago's attorneys demanded the return of the $1.2 million in principal, along with the promised interest and fees, in accordance with the terms of the escrow agreement. No funds were returned to Murcielago or Mr. T.S., who suffered the loss of the full $1.2 million he had agreed to place in Sniffen's escrow account.

53

### Executions of the Scheme and Artifice to Defraud

15.    On or about the dates indicated below, in the District of Maryland and elsewhere, the defendants

**PATRICK J. BELZNER,**
**a/k/a "Patrick McCloskey,"**
**MERVYN A. PHELAN, SR.,**
**and**
**GREGORY E. GRANTHAM,**

together with Brian McCloskey, Kevin Sniffen, and others known and unknown to the Grand Jury, for the purpose of executing the scheme and artifice to defraud, and attempting to do so, knowingly and willfully caused to be transmitted in interstate commerce by means of wire communication certain signs and signals, to wit: the wire transmissions set forth below:

| COUNT | DESCRIPTION OF WIRE TRANSMISSION |
|---|---|
| 39 | E-mail dated June 13, 2011 from **BELZNER** in Maryland to Ms. K.A. in Massachusetts (as well as Sniffen and McCloskey in Maryland) attaching copies of Letters of Intent |
| 40 | E-mail dated June 13, 2011 sent by Ms. K.A. in Massachusetts to Ms. L.P. at The Sorkin-Shapiro Group in Bethesda, Maryland directing that a wire transfer in the amount of $1.2 million be sent from account # xxx-x7008 at Merrill Lynch to account # xxxxxxxxx0766 in the name of "Kevin E. Sniffen Esquire FBO Murcielago" at Wachovia Bank, NA of Maryland |
| 41 | E-Mail dated June 15, 2011, sent from Sniffen in Maryland to Ms. K.A. in Massachusetts, Mr. S.N., and Mr. T.S. on instructions from **BELZNER** representing that "Open Taxes, liens and assessments have been paid and will have copies of receipts and all recorded docs tomorrow morning" |
| 42 | Facsimile sent on or about July 19, 2011 from the McCloskey Group in Maryland to Ms. K.A. in Massachusetts of an altered and fraudulent Wachovia Bank statement purportedly showing a balance of $1.5 million in the "FBO Murcielago" escrow account # 0766 |

| 43 | E-mail transmission dated July 28, 2011 from **BELZNER** in Maryland to Ms. K.A. in Massachusetts purporting to provide an update on the process of obtaining tax receipts and recording documents |
|----|----|

18 U.S.C. § 1343
18 U.S.C. § 2

## COUNT FORTY-FOUR

### (Obstruction of Justice)

1.      The allegations contained in paragraphs 1 through 7 and 9 through 26 of Count One are realleged and incorporated here.

2.      During the summer and fall of 2012, the Wednesday Special Grand Jury for the July Term 2012 ("the Special Grand Jury") was continuing the investigation of the transactions set forth above, which had originally commenced before a previous federal grand jury sitting in the District of Maryland.   By this time, defendant **BELZNER** had already been indicted on a single charge of conspiracy to commit wire fraud, and this fact was publicly known.

3.      On or about September 26, 2012, grand jury subpoenas *duces tecum* issued under the authority of the Special Grand Jury were served by FBI agents upon **GRANTHAM** and **PHELAN** at their offices in Newport Beach, California.   These subpoenas called for the production of documents relating to the transactions discussed in the preceding counts of this indictment from Preferred Senior Holdings, LLC; Workmen's Life Insurance Company; IAGU, TAG, and Insurance Group Annuity Underwriters, LLC, as well as from **PHELAN**, **GRANTHAM**, and Sean Krondak in their individual capacities.   A grand jury subpoena *ad testificandum* calling for personal testimony before the grand jury was also served upon Krondak.

4.      These subpoenas *duces tecum* specifically sought any and all documents and records that were possessed or controlled by **PHELAN, GRANTHAM,** Krondak, Preferred Senior Holdings, TAG, WLIC, and IAGU that related to any actual, prospective, or contemplated commercial or business transactions of any kind, including

56

but not limited to real estate transactions and loan agreements or financial guarantees, between any of their companies and a list of 23 individuals and entities who were involved in the transactions discussed in the preceding counts of this indictment.

5.    Following the service of the subpoenas, **GRANTHAM** on several occasions communicated with the U.S. Attorney's Office in Baltimore, Maryland, and with the FBI agent assigned to the matter, with regard to the timing of the production of the materials requested and other aspects of compliance with the subpoenas.

6.    Upon receipt of the grand jury subpoenas, **PHELAN, GRANTHAM,** and Krondak met to discuss how they would respond to the subpoenas.   They agreed that they would not produce certain responsive records that were then on their computers or otherwise within their possession, custody, or control, because those particular records would reveal their knowledge of, and involvement in, the fraudulent escrow scheme, particularly with regard to **PHELAN's** and **GRANTHAM's** coordinating with **BELZNER** and McCloskey to provide false and misleading information to various creditors of the McCloskey Group, and their counsel, as well as Mr. E.M.

7.    **GRANTHAM** took the principal responsibility for coordinating the response to the grand jury subpoenas.   He consulted with **PHELAN** and Krondak about whether particular responsive but incriminating items should be produced, sometimes directing them not to produce or to delete particular items from their computers.   He also reviewed hard copies of records and compact discs (CDs) on which Krondak had copied e-mail communications and in some cases deleted additional documents from these discs before they were produced.

8.     The records that **PHELAN, GRANTHAM,** and Krondak were willing to produce were copied onto CDs, and on November 19, 2012, Krondak produced these to the FBI by shipping them via overnight mail to the FBI's office in Maryland.   Among the material records that **PHELAN, GRANTHAM,** and Krondak intentionally concealed and withheld from their production to the grand jury were the following:

- an e-mail dated January 19, 2011 at 10:10 a.m. from **PHELAN** to **BELZNER** and McCloskey with the subject line "OVERDRAFTS . . . CRISIS," in which **PHELAN** remonstrated with them for not having sent $30,000 in fees he was expecting, leaving him "broke after covering all the issues" with Mr. B.L. and Mr. J.C., Mr. G.C.'s counsel;

- an e-mail dated February 22, 2011 at 12:23 p.m. from **BELZNER** to **PHELAN** and McCloskey with the subject line "George," in which **BELZNER** provided **PHELAN** with instructions for an e-mail to be sent to Mr. G.C. ostensibly updating him on **PHELAN's** conversations with a loan participant;

- an e-mail dated February 23, 2011 at 4:45 p.m. that was sent from "Pat" to **PHELAN** (which was also copied to McCloskey) with the subject line "Ben," in which **BELZNER** summarized for **PHELAN** false information he had previously provided to Mr. B.L. and Mr. E.M., and which further instructed **PHELAN** to provide additional false information to Mr. B.L. and Mr. E.M. in order to encourage them not to press for the return of their funds;

- an e-mail dated March 4, 2011 at 12:07 p.m. from **BELZNER** to **PHELAN** and McCloskey with the subject line "George," in which **BELZNER** provided **PHELAN** with instructions for an e-mail to be sent to Mr. G.C. and his counsel Mr. J.C., ostensibly updating him on **PHELAN's** conversations with a lender;

- an e-mail chain concluding on March 4, 2011 at 1:18 p.m. that included an e-mail sent by **PHELAN** to Mr. G.C., his counsel, Mr. J.C., and McCloskey at 1:09 p.m that followed largely *verbatim* the text of the proposed e-mail sent at 12:07 p.m. that same day by **BELZNER;**

- an e-mail dated March 9, 2011 at 1:29 p.m. that was sent from "Pat" to **PHELAN** headed "McCloskey Closings," which provided the text

58

for an e-mail to be sent by **PHELAN** ostensibly reporting on IAGU's progress in closing the construction loans for the Estates of McCormick, Brigadoon, and York properties;

- an e-mail dated March 10, 2011 at 4:25 p.m. that was sent from "Pat" to **PHELAN** and **GRANTHAM** headed with the last name of Mr. R.B., "Closings," who was Mr. R.R.'s attorney, which provided the text for an e-mail to be sent by **PHELAN** or **GRANTHAM** to Mr. R.B., purporting to explain the reasons why the McCormick, Brigadoon, and York project loans had not yet closed;

- an e-mail chain ending on March 12, 2011 at 9:44 a.m. that was sent from **PHELAN** to "Pat" and McCloskey with the subject line "FW: Status of Loans," which included several e-mails exchanged between **GRANTHAM** and Mr. R.B., including a lengthy e-mail from **GRANTHAM** to Mr. R.B. sent on March 10 that tracked almost verbatim the proposed text sent by **BELZNER** the previous day;

- an e-mail dated April 6, 2011 at 2:09 p.m. that was sent from "Pat" to **PHELAN** and copied to **GRANTHAM** referring to Mr. B.L. in the subject line, which provided the text for an e-mail to be sent by **PHELAN** to Mr. B.L. purportedly reporting on the imminent closing of the loans relating to the Namkeb or Repid transactions, but also stating that "Brian asked if we could instruct Kevin to release the escrow now and that is absolutely not accomplishable;"

- an e-mail dated April 7, 2011 at 2:21 p.m. that was sent from **GRANTHAM** to Mr. R.R. and copied to McCloskey with the subject line "75th Street Partners – Ocean City," in which **GRANTHAM** made representations about the current status of the Ocean City and Estates of McCormick loans;

- an e-mail dated April 11, 2011 at 3:11 p.m. that was sent from **GRANTHAM** to Mr. R.R. and his counsel Mr. R.B. and copied to McCloskey with the subject line "McCormick," in which **GRANTHAM** represented that "we have received our participant's funds" on the Estates of McCormick loan;

- an e-mail dated May 7, 2011 at 12:33 p.m. that was sent from **PHELAN** to **BELZNER**, McCloskey, and **GRANTHAM** with the subject line "SATURDAY DRAFT FOR [Mr. B.L.]" in which **PHELAN** set out the text for a proposed e-mail to Mr. B.L. setting out a false explanation for another two-week delay in loan funding;

- an e-mail dated May 11, 2011 at 11:44 a.m. that was sent from **BELZNER** to **GRANTHAM**, **PHELAN**, and McCloskey with the last name of Mr. R.R.'s counsel in the subject line, which provided the text for a letter to be sent out by **GRANTHAM** to attorney R.B. and McCloskey ostensibly reporting on the process of finalizing the Estates of McCormick loan.

## The Charge

9.    From on or about September 26, 2012 and continuing until on or about December 13, 2012, the exact date or dates being unknown to the grand jury, in the District of Maryland and elsewhere, the defendants

**MERVYN A. PHELAN, SR.,**
**and**
**GREGORY E. GRANTHAM,**

together with Sean Krondak, having knowledge of the grand jury investigation proceeding in the District of Maryland, did corruptly influence, obstruct and impede, did endeavor to influence, obstruct and impede the due administration of justice in a proceeding before the Special Grand Jury sitting in the District of Maryland which was continuing to investigate the transactions detailed above by withholding and concealing, and by causing to be withheld and concealed certain records which were commanded by the grand jury subpoenas *duces tecum* and which were material to the grand jury's investigation, specifically, e-mail communications between **PHELAN** and **GRANTHAM** and **BELZNER**, McCloskey, Sniffen and various victim lenders and investors.

18 U.S.C. § 1503
18 U.S.C. § 2

## COUNT FORTY-FIVE

### (Evasion of Assessed Tax Payments)

1.    The allegations of paragraphs 1 through 2 of Count One are realleged and incorporated here.

2.    The Internal Revenue Service (IRS) is an agency within the United States Department of the Treasury that is responsible for administering and enforcing the tax laws of the United States and collecting taxes owed to the Treasury of the United States by its citizens and other entities.

### BELZNER's Receipt of Unreported Income from Monumental Supply Company in 1995-96 and in 1998

3.    During the years 1995, 1996 and 1998, **BELZNER** obtained additional income beyond his salary amounting to $1,111,304.78, more or less, from his then-employer, Monumental Supply Company, which he then did not report on his federal income tax returns for the tax years 1995, 1996, and 1998.

### BELZNER's Receipt of Unreported Income from U.S. Foodservice Company in 1998

4.    In 1998, **BELZNER** obtained additional income beyond his salary amounting to $186,146.71, more or less, from his then-employer, U.S. Foodservice Company, which he did not report on his federal income tax returns for the tax year 1998.

## BELZNER's Receipt of Additional Unreported Income in 1998-99

5.      In 1998 and 1999, unexplained deposits totaling $241,773 were made into Belzner's bank accounts, which he did not report on his federal income tax returns for the tax years 1998 and 1999.

## BELZNER's Tax Assessments for Unpaid Federal Income Taxes

6.      In or about the year 2000, the IRS became aware of the unreported income **BELZNER** had obtained from Monumental Supply Company and U.S. Foodservice and initiated an audit of **BELZNER's** tax returns for the tax years 1995 through 1999.

7.      As a result of that audit, in August 2003, the IRS assessed additional taxes, penalties, and interest against **BELZNER** totaling $1,150,935.25, based upon $35,505.39 for the 1995 tax year and $1,115,429.86 for the 1996 tax year.

8.      In May 2005, the IRS assessed additional taxes and penalties against **BELZNER** totaling $246,424.50, based upon $215,490.90 for the 1998 tax year and $30,933.60 for the 1999 tax year.   Thus, the total amount of the August 2003 and May 2005 assessments at their inception, along with penalties and interest, was $1,397,359.75.   Once these initial assessments of back taxes, penalties, and interest were imposed, an additional failure to pay penalty was later assessed for each tax year as a result of **BELZNER's** continued failure to make payment, and additional interest continued to accrue on the unpaid balances.

9.      **BELZNER** did not contest the August 2003 assessment in the United States Tax Court.   In October 2004, he signed a Form 870-c whereby he affirmatively consented to the assessment and collection of the back taxes and penalties imposed for

the Tax Years 1998 and 1999, plus interest as provided by law, and waived any right to contest these assessments in the United States Tax Court.

### The IRS's Collection Efforts

10.     Beginning in 2003 and continuing through 2010, the IRS sent approximately 25 separate notices to **BELZNER**, and to persons who had received a Power of Attorney authorizing them to act on his behalf in his dealings with the IRS, notifying him of his unpaid taxes and advising him of the IRS's intent to levy property and seize assets if the taxes were not paid.

11.     Between January 2006 and June 2011, **BELZNER** received substantial income from construction and real estate development activities, as well as through his employment (from January 2009 through June 2011) with the McCloskey Group. Although the McCloskey Group did not pay **BELZNER** a salary, it paid many of his personal living expenses, including mortgage and car payments, health and life insurance premiums, and utility bills.

12.     Notwithstanding the substantial income he received, **BELZNER** represented in periodic filings submitted to the IRS that he lacked the means to make significant payments towards his outstanding tax liability.   As a result, from the time the tax assessments were imposed in August 2003 and May 2005 respectively through June 2011, the IRS was able to collect nothing on its assessments against **BELZNER.**

### Acts of Evasion

13.    From in or about January 2006 and continuing through in or about June 2011, in the District of Maryland, the defendant,

**PATRICK BELZNER,**
**a/k/a "Patrick McCloskey,"**

did unlawfully, willfully, and knowingly attempt to evade and defeat the payment of back taxes, penalties, and interest that were assessed against him by the IRS for the tax years 1995, 1996, 1998, and 1999 by committing affirmative acts of evasion to conceal from the IRS the nature and extent of his income and assets and the location thereof.   The various means of evasion that **BELZNER** employed included the following:

(a)    In February 2006 and then again in January 2009, **BELZNER** filed false Form 433 Collection Information Statements (CIS) in which he failed to disclose assets, bank accounts, and sources of income that he controlled that would have enabled him to make payments on his tax debts.   **BELZNER** also made false statements to IRS collections officers in January 2006 and June 2009 relating to his monthly income and to the ownership of his personal residence.

(b)    **BELZNER** formed in excess of 20 different limited liability corporations (LLCs) that he controlled, although he was not listed as owning an interest in them. **BELZNER** then placed assets in the name of these LLCs, including real estate and automobiles, and obtained bank accounts in their names which he used to pay for his and his family's personal living expenses and expenditures, including mortgage payments, ground rent payments for a vacation home in a trailer park near the Delaware shore, construction costs on his new residence in Glen Arm, Maryland, car payments,

64

credit card payments, utility bills, health and life insurance premiums, medical expenses, private school tuition payments, and Baltimore Ravens season tickets.  By this means, **BELZNER** concealed assets and sources of income that might otherwise have been subject to levy or garnishment by the IRS.

(c)     **BELZNER** also used front persons or "straw buyers" to acquire real properties that were placed in their names, rather than that of **BELZNER**, thereby serving to conceal these properties from the IRS.  At various times, **BELZNER** arranged for his family's residences in Baltimore County to be held in the name of two LLCs which served as nominee owners.

(d)     **BELZNER** employed several individuals, including Mr. R.M., Mr. C.C., and Mr. J.K., to conduct financial transactions on his behalf, including converting checks into cash, and to store records relating to his business and financial activities at locations other than **BELZNER's** personal residence, thus frustrating the IRS's ability to collect.

(e)     From 2009 through June 2011, while **BELZNER** was working with Brian McCloskey at the McCloskey Group, **BELZNER** arranged to have the McCloskey Group pay for the majority of his personal living expenses in return for his assistance in helping to locate financing for real estate development projects undertaken by the McCloskey Group.   Between January 2009 and June 2011, the McCloskey Group paid more than $1.5 million to cover various personal expenditures on **BELZNER's** behalf, including the payment of personal loans, car payments, health and life insurance premiums, utility bills, cable bills, and on many occasions the monthly mortgage payments on **BELZNER's** new residence.

(f) **BELZNER** also instructed Brian McCloskey and a McCloskey Group secretary who had signature authority on the McCloskey Group's checking accounts, to write checks payable to two other McCloskey Group employees, Mr. R.B. and D.W., as well as to **BELZNER's** associate Mr. R.M. **BELZNER** then instructed these individuals to cash these checks and to either bring him the cash, or to give the cash to creditors of his at various pre-arranged meeting locations. In all, between November 2009 and June 2011, **BELZNER** caused $175,870 in McCloskey Group checks to be made payable to these individuals for the purposes set forth above.

26 U.S.C. § 7201

## FORFEITURE

The Grand Jury further finds that:

1.      Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of an offense in violation of 18 U.S.C. §1349, as alleged in Count One,

**PATRICK J. BELZNER,**
**a/k/a "Patrick McCloskey,"**
**MERVYN A. PHELAN, SR.,**
**and**
**GREGORY E. GRANTHAM,**

the defendants herein, shall forfeit to the United States of America all property, real and personal, which constitutes and is derived from proceeds traceable to the scheme to defraud.

2.      The property to be forfeited includes, but is not limited to, a sum of money equal to the value of the proceeds of the scheme to defraud which amount is at least $23 million.

3.      If any of the property described above, as a result of any act or omission of the defendants:

        (a)      cannot be located upon the exercise of due diligence;

        (b)      has been transferred or sold to, or deposited with, a third party;

        (c)      has been placed beyond the jurisdiction of the court;

        (d)      has been substantially diminished in value; or

        (e)      has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property

67

pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c).


18 U.S.C. § 981(a)(1)(C)
28 U.S.C. § 2461(c)
FED. R. CRIM. P. 32.2(a)


_____
ROD J. ROSENSTEIN
United States Attorney


A TRUE BILL:


**SIGNATURE REDACTED**

_____

_____
Date   10/9/13

68